Camelot Event Driven Fund v Morgan Stanley & Co. LLC (2023 NY Slip Op 50080(U))

[*1]

Camelot Event Driven Fund v Morgan Stanley & Co. LLC

2023 NY Slip Op 50080(U)

Decided on February 6, 2023

Supreme Court, New York County

Borrok, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 6, 2023
Supreme Court, New York County

Camelot Event Driven Fund, a Series of Frank Funds Trust, Plaintiff,

against
Morgan Stanley & Co. LLC, J.P. MORGAN SECURITIES, LLC, CITIGROUP GLOBAL MARKETS INC., GOLDMAN SACHS & CO. LLC, MIZUHO SECURITIES USA LLC, SIEBERT WILLIAMS SHANK & CO., LLC, BNP PARIBAS SECURITIES CORP., RBC CAPITAL MARKETS, LLC, U.S. BANCORP INVESTMENTS, INC., SMBC NIKKO SECURITIES AMERICA, INC., TD SECURITIES (USA) LLC, SG AMERICAS SECURITIES, LLC, MUFG SECURITIES AMERICAS INC., CASTLEOAK SECURITIES, L.P., SAMUEL A. RAMIREZ & COMPANY, INC., ACADEMY SECURITIES, INC., R. SEELAUS & CO. LLC, WELLS FARGO SECURITIES, LLC, BNY MELLON CAPITAL MARKETS, LLC, INTESA SANPAOLO S.P.A., ICBC STANDARD BANK PLC, VIACOMCBS, INC., ROBERT M. BAKISH, KATHERINE GILL-CHAREST, SHARI E. REDSTONE, CANDACE K. BEINECKE, BARBARA M. BYRNE, LINDA M. GRIEGO, ROBERT N. KLIEGER, JUDITH A. MCHALE, RONALD L. NELSON, CHARLES E. PHILLIPS JR, SUSAN SCHUMAN, NICOLE SELIGMAN, FREDERICK O. TERRELL, Defendant.

Index No. 654959/2021

Plaintiffs by:
Bernstein Litowitz Berger & Grossmann LLP, 1251 Avenue of the Americas, 44th Floor, New York, NY 10020
Glancy Prongay & Murray LLP, 745 Fifth Avenue, 5th Floor, New York, NY 10151
Defendants by:
Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, New York, NY 10001
Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017
Cadwalader, Wickersham & Taft LLP, 200 Liberty St., New York, NY 10281
Latham & Watkins LLP, 1271 Avenue of the Americas, New York, NY 10020
Willkie Farr & Gallagher LLP, 787 7th Ave, New York, NY 10019
Sidley Austin LLP, 787 7th Ave, New York, NY 10019; 1001 Page Mill Rd, Bldg 1, Palo Alto, CA 94304
Shearman & Sterling LLP, 599 Lexington Ave, New York, NY 10022; 401 9th St NW, Washington, DC 20004

Andrew Borrok, J.

The following e-filed documents, listed by NYSCEF document number (Motion 002) 76, 77, 78, 79, 80, 81, 93, 141, 148, 149, 150, 151 were read on this motion to/for DISMISS.
The following e-filed documents, listed by NYSCEF document number (Motion 003) 82, 83, 84, 85, 86, 87, 88, 89, 90, 153, 154, 155, 156 were read on this motion to/for DISMISS.
The following e-filed documents, listed by NYSCEF document number (Motion 004) 91, 92, 147 were read on this motion to/for DISMISS.
The following e-filed documents, listed by NYSCEF document number (Motion 005) 96, 97, 98, 99, 100, 101, 102, 103, 104, 144 were read on this motion to/for DISMISSAL.
The following e-filed documents, listed by NYSCEF document number (Motion 006) 105, 106, 157 were read on this motion to/for DISMISS.
The following e-filed documents, listed by NYSCEF document number (Motion 007) 107, 108, 109, 110, 111, 152 were read on this motion to/for DISMISSAL.
The following e-filed documents, listed by NYSCEF document number (Motion 008) 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 145 were read on this motion to/for DISMISS.
The following e-filed documents, listed by NYSCEF document number (Motion 009) 126, 127, 146 were read on this motion to/for DISMISS.
Summary of Decision
The case against Viacom/CBS (Viacom) must be dismissed because Viacom can not be held liable under the Securities Act of 1933 (the 1933 Act) for the undisclosed unknown (i) synthetic position of Archegos Capital Management, LP (Archegos) created pursuant to certain "total return swap agreements" with certain broker dealers/swap counter-parties, some of whom happen to have been underwriters in connection with the SPOs (hereinafter defined) and (ii) block sales of Viacom stock that those swap counter-parties planned and executed when Archegos could not meet its margin call. 
As alleged, Archegos' position was concealed to Viacom because Archegos was not required to make any public filings in respect of its Viacom position for two reasons. First, its actual stock ownership was below the amount which requires making a filing by the Securities and Exchange Commission (the SEC), and second, its synthetic position created under the "total return swap agreements" also did not require disclosure under SEC rules. 
Under the 1933 Act, Viacom also had no duty or obligation to perform due diligence on its underwriters as to any proposed conflicts that the underwriters might have had. The duty imposed upon issuers is to present truthful and accurate material information about their financial position, outlook, risk factors that affect or could impact their performance and the manner in which their books and records, outlook and guidance are created and audited. Thus, omissions alleged, all of which are predicated on an underwriter's potential undisclosed conflicts are simply not within the ambit of an issuer's due diligence obligations and statements and [*2]omissions in the offering documents relating to the underwriters are simply not attributable to the issuer. The diligence required of an issuer as to an underwriter is set forth in the statute and in the regulations and is limited to, among other things, understanding that the underwriters are capable of bringing the securities to market and that failing the market clearing the offering that the underwriters are capable of buying a pre-set amount of unsold shares — i.e., stabilizing transactions — which are disclosed. Neither the statute nor the SEC rules impose any further duty of diligence upon issuers with respect to the underwriters, nor make the issuer a guarantor of the underwriters undisclosed trading positions. Implying any such duty runs afoul of the principles articulated in Central Bank of Denver, N.A. v First Interstate Bank of Denver, N.A., 511 US 164 (1994). It does not therefore matter that issuers do not have a due diligence defense under the 1933 Act. For completeness, FINRA Rule 5270 also does not provide a predicate for a 1933 Act claim against Viacom because Viacom is neither a FINRA member nor are they associated with one for the purpose of imposing liability under the 1933 Act. 
Because the Section 11 and 12 claims are dismissed as against Viacom, the Section 15 claims against Robert M. Bakish, Katherine Gill-Charest, Shari E. Redstone, Candace K. Beinecke, Barbara M. Byrne, Linda M. Griego, Robert N. Klieger, Judith A. McHale Ronald L. Nelson, Charles E. Phillips, J., Susan Schuman Nicole Seligman, and Frederick O. Terrell (collectively, hereinafter, the Individual Defendants) must be dismissed as well.
The Conflicted Defendants (hereinafter defined) however are not entitled to dismissal of this lawsuit. The claims in this lawsuit are based on their planned undisclosed massive and uncoordinated block sales of approximately $20 billion of Viacom stock conducted simultaneously with the $2.65 billion of SPOs that the Conflicted Defendants were underwriting to close out their exposure under certain "total return swap agreements" while earning underwriter fees in connection with those SPOs. Taking the allegations of the AC (hereinafter defined) as true, the Conflicted Defendants unquestionably had an undisclosed material conflict of interest and there was a material omission of that material conflict in the Offering Documents (hereinafter defined) because their approximately $20 billion of market sales necessarily put substantial downward pressure on the price of Viacom's stock in the SPOs. The Conflicted Defendants' claim that there were internal ethical walls separating their broker-dealer business from their underwriter business does not change the result. As an initial matter, this alleged fact would only create an issue of fact going forward, not a basis for dismissal. In any event, basic compliance functions at the Conflicted Defendants would have placed someone in a position to look over these walls to prevent exactly what happened here from happening.
The Underwriter Defendants (that are not Conflicted Defendants) are also not entitled to dismissal of this lawsuit. The AC does not establish their affirmative due diligence defense. It does not matter that the size of Archegos' position and the vulnerability of Viacom's stock price and the SPOs were concealed from the public and from Viacom. They were not concealed from the Conflicted Defendants. As discussed below, the Underwriter Defendants had an obligation to ask each other about whether they had any conflicts, including conflicts that could undermine the market for Viacom's stock, and could not rely on the lead underwriters to come forward without asking any questions, i.e., the Conflicted Defendants in meeting their obligation (17 CFR § 230.176). To the extent that the Underwriter Defendants ultimately can establish an affirmative due diligence defense based on having asked all appropriate questions and conducted the appropriate analysis, this is not established by the AC on its face, and is otherwise not ripe for adjudication at this stage of the proceeding (In re WorldCom, Inc. Sec. Litig., 346 FSupp2d [*3]628, 683 [SD NY 2004]; In re Lehman Bros Sec. & ERISA Litig., 799 FSupp2d 258, 317 [SD NY 2011]). 

The Relevant Facts and Circumstances
This is a lawsuit caused by the failed stock speculation of Sung Kook Hwang and the financial collapse of his family run office, Archegos and the dissemination of those failures by the Conflicted Defendants (i.e., certain of the Underwriter Defendants who also served as undisclosed counter-parties to massive "total return swap agreements" with Archegos) on the uninformed and unsuspecting plaintiff investors who purchased common and preferred stock in the approximately $2.65 billion [FN1]
Secondary Public Offerings (the SPOs) of Viacom. The SPOs were effective on March 22, 2021 and closed on March 26, 2021. More specifically, the Plaintiffs allege that during the SPOs and between March 22, 2021 and March 28, 2021, the Conflicted Defendants dumped in certain block sales approximately $20 billion of Viacom Stock— i.e., almost 10 times the size of the offering and representing a 34% equity stake in the company — which they held pursuant to certain "total return swap agreements" entered into with Archegos (NYSCEF Doc. No. 74, ¶¶ 65-71). The Plaintiffs allege that these massive block sales were anticipated during the SPOs and were never disclosed. Thus, the Plaintiffs allege that the defendants violated Sections 11, 12(a) and 15 of the 1933 Act.
A. Mr. Hwang and Archegos
Mr. Hwang was a former New York-based hedge fund manager who had a well-known history of extensive and egregious investment-related misconduct (NYSCEF Doc. No. 74, ¶ 66). To wit, before founding Archegos in 2013, Mr. Hwang had founded and run Tiger Asia Management. The SEC filed insider-trading and stock manipulation charges against him. To settle those charges, he closed that fund, paid more than $44 million in fines and was barred from the investment-advisory industry (id., ¶¶ 66, 76). In addition, the U.S. Department of Justice criminally charged Mr. Hwang with wire fraud and his fund pled guilty to those charges. Subsequently, in 2014, Hong Kong regulators banned Mr. Hwang from trading on the Hong Kong Stock Exchange because of his misconduct (id., ¶ 66). In April 2020, the SEC partially lifted the bar on Mr. Hwang (id., ¶ 76). Archegos was Mr. Hwang's family office incorporated in Delaware with a principal place of business at 888 Seventh Avenue, New York, New York. 
B. The Parties
Viacom
Viacom is a global entertainment and media company incorporated under the laws of Delaware with a principal place of business in New York (NYSCEF Doc. No. 74, ¶ 50). During the week of March 22, 2021, Viacom conducted the SPOs of Viacom Common and Preferred Stock at $85 and $100 per share, respectively (id., ¶ 1). The purpose of the SPOs was to raise money for Viacom's streaming platforms (id., ¶ 137). On March 22, 2021, Viacom announced that it would conduct the SPOs of $2 billion worth of common stock and $1 billion of preferred stock:
136. At 4:17 p.m. ET on Monday, March 22, 2021, just before the market closed, Viacom [*4]announced that it would conduct the Offerings of $2.0 billion worth of Common Stock and $1.0 billion of Preferred Stock. Viacom's announcement stated that "Morgan Stanley and J.P. Morgan are acting as joint book-running managers for the Offerings" and directed investors to Morgan Stanley and J.P. Morgan for further information, including the preliminary prospectus supplements for the Offerings. On information and belief, Morgan Stanley and J.P. Morgan, on behalf of all of the Underwriter Defendants, reviewed and approved Viacom's announcement before it was issued
(id., ¶ 136). As discussed below, according to the well pled AC, this amount was downsized because, among other things, Archegos was to be the anchor investor in the SPOs and Archegos pulled out. Viacom was however not a counter-party to the "total return swap agreements" and the AC does not adequately allege facts that Viacom knew about Archegos or their synthetic long positions discussed below or that Viacom had any duty to have found out about Archegos and, as discussed below, Archegos was not required to make any filings with the SEC on account of its leveraged positions of Viacom stock that certain broker-dealers, including the Conflicted Defendants, owned as counter-parties to Archegos' swap positions.
The Conflicted Defendants
As discussed above, Archegos entered into a series of "total return swap agreements" with certain prime brokers, including Morgan Stanley, Goldman Sachs, Wells Fargo, PNB Paribas and MUFG Securities (collectively, hereinafter, the Conflicted Defendants) pursuant to which it acquired $120 billion of stock exposure across a number of securities, $20 billion of which was in Viacom stock. The Plaintiffs allege that the Conflicted Defendants had a conflict of interest because they acted both as underwriters of the stock and prime brokers or swap counter-parties for Archegos' total return swaps agreements (NYSCEF Doc. No. 74, ¶ 49) such that, because of Archegos' massive leveraged position in Viacom, if Archegos could not meet (as it did not meet) margin calls, the Conflicted Defendants, while promoting the sale of Viacom stock in the SPOs and while permitted to execute certain market stabilizing transactions as they disclosed in the Offering Documents, the Conflicted Defendants had incentive to sell the securities that they themselves held pursuant to the "total return swap agreements" to minimize their own exposure, putting undisclosed downward pressure on pricing of the SPOs stock and not for the purpose of stabilizing the SPOs.
The Underwriter Defendants
The SPOs were underwritten by Morgan Stanley, JP Morgan, Citigroup, Goldman Sachs, Mizuho, Sibert, BNP Paribas, RBC Capital, US Bancorp, SMBC, TD Securities, SG Americas, MUFG Securities, CastleOak, Ramirez, Academy, R. Seelau, Wells Fargo, BNY Melon, Intesa, and ICBC (collectively, the Underwriter Defendants) (NYSCEF Doc. No 74, ¶ 48). Morgan Stanley and JP Morgan acted as joint book-runners. The SPOs were firm commitment underwritings, such that the Underwriter Defendants were obligated to take and pay for all of the offered securities and bear inventory risks associated with any shares they were unable to resell to investors (id., ¶ 25).
C. The Archegos Total Return Swap Agreements
In a "total return swap agreement", the prime broker (or swap counter-party) purchases a [*5]security, the investor (here, Archegos) receives the total rate of return of that security in exchange for a fee generally based off of an interest rate such as LIBOR or the secured overnight financing rate. At the end of the contract, if the stock goes up, the investor receives the difference in the value between the original price and the new higher price, and if the stock goes down, the investor must pay the difference in the market value between the original price and the then declined price. From the investor's perspective, it is the same as if the position was entirely leveraged in that the investor pays the fees or interest on the amount of borrowed funds and experiences either a gain or loss depending on the performance of the underlying security. 
Significantly, the underlying security is purchased by the prime broker/swap-counter party and not the investor directly. The underlying security does not appear on the investor's balance sheet. The investor has a synthetic long position based on the performance of the underlying stock. At maturity, the investor may, but is not obligated to, purchase the underlying asset at the prevailing price. Because the underlying securities do not appear on the investor's balance sheet, even if the investor acquires a substantial exposure (as Archegos did), the position may not be publicly known as the investor need not file a Form 13D with the SEC (NYSCEF Doc. No. 74, ¶¶ 86-94)[FN2]
. This matters because these disclosures are required so that the investing public can assess the risks associated with any large concentrated position. 
As alleged in the AC:
94. Here, Archegos's total return swaps allowed it to effectively become Viacom's single largest public shareholder—with exposure of approximately $20 billion based on swaps, representing a 34% equity stake in Viacom—without any public disclosure of its position. While the Underwriter Defendants who served as Archegos's prime brokers knew or should have known about Archegos's Viacom stake based on their access to information about Archegos's investments, public investors were in the dark with no way of knowing about the risks that Archegos's Viacom exposure created.
95. Because in a swap transaction the banks purchase the underlying stock and the investor does not, Archegos was able to take long economic positions in securities while avoiding disclosing its significant ownership to the investing public. Because Archegos invested primarily in swaps instead of the underlying securities, Archegos's outsized positions could also drive up the securities' prices while Archegos's positions were concealed from the public. Use of swaps to avoid requirements to disclose large equity positions is a known practice in the investment-banking industry and a source of criticism of total return swaps generally. An April 1, 2021 article in the Wall Street Journal described this disclosure-avoidance problem:
By using swaps, sophisticated investors can sidestep requirements to disclose big stakes in companies. Under Securities and Exchange Commission rules, any person or firm that [*6]acquires more than 5% of a company's shares must publicly disclose the stake. Additional disclosure rules apply if the stakes exceed 10%. Large investment firms must also disclose their stockholdings at the end of each quarter, albeit with a 45-day delay.
None of those rules apply if an investor uses swaps to amass the equivalent of a large stake in a publicly traded corporation. That appears to have helped Archegos stay under the radar until it blew up. Archegos is estimated to have had exposure to the economics of more than 10% of multiple companies' shares.. 
. . 104. Viacom was Archegos's single largest long position. According to the Paul Weiss Report, "[a]s of March 22, 2021, the gross market value of Archegos's Viacom stock holding was approximately $5.1 billion." This translated to approximately 9% of the Company's outstanding Common Stock at the time (not including Archegos's additional, even larger indirect long position in Viacom Common Stock through total return swaps)4 and barely skirted the 10% disclosure rule intended to inform investors of the Company's exposure to such a highly concentrated investor.
105. When combined with its swap holdings, Archegos had even greater economic exposure to Viacom Common Stock. As an April 3, 2021 article in the New York Times that cited people familiar with Hwang reported, Archegos had effectively become the single largest institutional investor in Viacom by mid-March, with total exposure valued at $20 billion. But as detailed in this Complaint, Archegos's enormous effective long positions in Viacom stock through swap transactions were unknown and unknowable to investors in the Offerings.
(id., ¶¶ 94-95, 104-105).
Because the prime brokers/swap counter-parties own the underlying securities, if the value of the underlying securities drop in value, the value of the collateral drops in value too. To address the widening gap in leverage (e.g., if $10 billion is posted against $120 billion and then the $120 billion value dips to $100 billion) the prime broker/swap counter-party can require the investor to post additional collateral (i.e., make a capital call) or if the investor can not make the capital call to shore up the position, the prime-broker/swap counter-party can sell the underlying securities and close out the swap. If the prime broker/swap counter-party sells the securities at a loss and the investor defaults on its margin call, the swap counter-party is at risk of suffering a substantial loss. Hence, the conflict of interest of the Conflicted Defendants.
In fact, the risks associated with Archegos' position and subsequent losses led to a $5.5 billion loss by Credit Suisse (NYSCEF Doc. No. 74, ¶ 82). As a result, Credit Suisse hired the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP (Paul Weiss) to conduct an internal investigation (id.). Paul Weiss published a report (the Paul Weiss Report; NYSCEF Doc. No. 30) that detailed various risks and attributing certain losses to certain risks. 
D. The Viacom SPO Disclosures About the Underwriters
The SPOs were made pursuant to a certain (i) Base Prospectus dated March 27, 2020 (NYSCEF Doc. No. 80), (ii) Common Stock Preliminary Prospectus Supplement dated March 23, 2021 (NYSCEF Doc. No. 79), (iii) Common Stock Free Writing Prospectus dated March 23, 2021, (iv) a Common Stock Prospectus Supplement dated March 25, 2021, (vi) Preferred Stock Preliminary Prospectus Supplement dated March 23, 2021 (NYSCEF Doc. No. 81), (vii) Preferred Stock Free Writing Prospectus dated March 23, 2021, and (viii) Preferred Stock [*7]Prospectus Supplement dated March 25, 2021 (collectively, hereinafter, the Offering Documents). 
The Common Stock Preliminary Prospectus Supplement had certain general precatory warnings including that stockholders may not be able to sell shares at attractive prices including that stock prices may fluctuate:
Stock markets in general and our Class B common stock in particular have experience significant price and trading volume volatility, including as a result of the ongoing COVID-19 pandemic. The market price and trading volume of our Class B common stock may continue to be subject to significant fluctuations due to various factors, as well as economic and geopolitical conditions in general and to variability in the prevailing sentiment regarding our operations or business prospects, as well as, among other things, changing investment priorities of our stockholders or prospective stockholders. Because the market price of our Class B common stock fluctuates significantly, stockholders may not be able to sell their shares at attractive prices
(NYSCEF Doc. No. 79, at S-5).
It further disclosed that the Underwriter Defendants themselves may engage in transactions that stabilize, maintain or otherwise affect the market price:
In order to facilitate the offering of the Class B common stock, the underwriters may engage in transactions that stabilize, maintain or otherwise affect the market price of the Class B common stock. Specifically, the underwriters may sell more shares than they are obligated to purchase under the underwriting agreement, creating a short position. A short sale is covered if the short position is no greater than the number of shares available for purchase by the underwriters under the option. The underwriters can close out a covered short sale by exercising the option or purchasing shares in the open market. In determining the source of shares to close out a covered short sale, the underwriters will consider, among other things, the open market price of shares compared to the price available under the option. The underwriters may also sell shares in excess of the option, creating a naked short position. The underwriters must close out any naked short position by purchasing shares in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the common stock in the open market after pricing that could adversely affect investors who purchase in this offering. As an additional means of facilitating this offering, the underwriters may bid for, and purchase, shares of common stock in the open market to stabilize the price of the common stock. These activities may raise or maintain the market price of the common stock above independent market levels or prevent or retard a decline in the market price of the common stock. The underwriters are not required to engage in these activities and may end any of these activities at any time. Such stabilization shall be in accordance with Regulation M
(id., at S-15).
E. The Alleged 1933 Act Violation
Leading up to the SPOs
The Plaintiffs allege that Archegos increased its holdings in Viacom in the months [*8]leading up to the Public Offerings. In particular, the Amended Complaint (the AC; NYSCEF Doc. No. 74) alleges that the Schedule 13F forms filed by the Conflicted Defendants and other prime brokers with the SEC demonstrate that Archegos substantially increased their Viacom holdings in the second and third quarters of 2020 (NYSCEF Doc. No. 74, ¶ 112). The problem is, as discussed above, the 13F filings do not in any way identify Archegos, and Viacom would not have a duty to look beyond the 13F findings to see if a concentrated synthetic position had been taken. The Plaintiffs allege that by March 22, 2021, Archegos directly held approximately 9% of Viacom's outstanding common stock, not including the stock it held through the total return swaps, and that this position narrowly avoided the required disclosure to investors that would have been required if Archegos held 10% or more of Viacom's common stock (id., ¶ 104). However, the Schedule 13F forms filed by the Conflicted Defendants also demonstrate that the Conflicted Defendants substantially decreased their holdings of Viacom common stock by the end of the first quarter of 2021, not even two weeks after the SPOs were announced (id., ¶¶ 113-115). 
On January 4, 2021, Viacom's common stock closed at $36.60 per share (NYSCEF Doc. No. 74, ¶ 108). That same day, Viacom announced an expanded distribution agreement with Hulu and on January 19, 2021, Viacom announced that it would launch its streaming platform Paramount+ by March 4, 2021 (id.). On January 19, 2021, Viacom's common stock closed at $43.75 and continued to climb, closing at $66.14 on February 22, 2021 (id.). This upward trend continued through the announcement of the SPOs:
110. Viacom Common Stock continued its upward momentum following that announcement. On March 22, 2021, Viacom's Common Stock closed at $100.34. According to a report in the Wall Street Journal dated March 28, 2021, "ViacomCBS shares had surged 160% since the start of the year through March 22, with the launch earlier this month of its new Paramount+ streaming service contributing to gains"
(NYSCEF Doc. No. 74, ¶ 110).
As alleged in the AC, the risk posed to Viacom as a result of Archegos' position, however, began to materialize before the SPOs were even announced:
131. Moreover, the risk posed by Archegos's highly concentrated positions began to materialize in early- to mid-March. As the Wall Street Journal reported on March 29, 2021:
Mr. Hwang's strategy began backfiring in recent weeks as the stock price of companies Archegos had significant exposure to, including in China Internet search giant Baidu Inc. and Farfetch, began to sell off. Baidu's stock price rose sharply in February, but by mid-March, its shares had dropped more than 20% from its highs.
Farfetch's stock followed a similar trajectory, dropping more than 15% off its February highs by March.
The announcement of additional financing by ViacomCBS early last week put further stress on Archegos, said people familiar with the matter, with news of the deal sparking a slide in the shares and adding to Archegos's mounting losses. The fund by that time had started selling some of its position in ViacomCBS to try to offset its losses, adding to pressure on the stock.
132. By March 2021, Archegos was teetering on the precipice of disaster. The Paul Weiss Report noted that by March 8, 2021—with respect to Archegos's precarious [*9]position at Credit Suisse alone—"the risk dimensions of the portfolio had significantly worsened":
Archegos's gross notional swap exposure had skyrocketed to $21 billion . . . and was net long biased by $7.3 billion . . . , with "aggressive" margins averaging 8- 9%, and single-issuer concentrations representing more than 8% of the outstanding float and the top five issuers representing 3-7 days' trading volume, meaning it would take "much longer" to liquidate the positions.
133. The Paul Weiss Report further detailed the impact of the announcement of the Viacom Offerings on an already stressed Archegos:
The market value of Archegos's portfolio—and thus the balance of variation margin—shifted precipitously during the week of March 22, 2021. ViacomCBS stock—Archegos's single largest long position—declined significantly in value, dropping 6.7% on March 22 alone and continuing to plummet throughout the week. This decline was precipitated, at least in part, by ViacomCBS's announcement on March 22 that it would be offering $2 billion of its Class B common stock and $1 billion of its Mandatory Convertible Preferred Stock—and the apparent lack of interest in that offering
(NYSCEF Doc. No. 74, ¶¶ 131-133 [emphasis in original]).
The SPOs and the Deterioration of Viacom's Share Price
On March 23, 2021, one day after the SPOs were announced, the price of Viacom's common stock dropped to $91.25 per share (NYSCEF Doc. No. 74, ¶ 144). In the AC, the Plaintiffs allege that analysts attributed this drop to the dilution in Viacom's public float that the SPOs created and that this drop was expected. The Plaintiffs further allege that the drop was really caused, however, by the Conflicted Defendants issuing margin calls to Archegos:
144. On Tuesday, March 23, 2021, Viacom's Common Stock price dropped to close at $91.25 per share. This initial drop, which analysts attributed to the dilution in Viacom's public float that the Offerings created, was expected. For example, Barclays' analysts reported on March 23, 2021 that "[y]esterday, ViacomCBS . . . announced the issuance of $2bn in equity and $1bn in mandatory convertible bonds [sic] which we believe is the right move strategically to build some balance sheet cushion to invest in streaming, especially given the company's weak cash flow position. An issuance anywhere close to the present stock price is likely to cause relatively small dilution."
145. A March 28, 2021 article in the Wall Street Journal noted that the announcement of the Offerings by Viacom put pressure on Archegos, which then started selling its positions in Viacom to offset losses, further adding increasing downward pressure on the stock. According to an April 1, 2021 report in the Wall Street Journal, a large Archegos position "on Monday of last week" (i.e., March 22, 2021), which on information and belief was Viacom, "dropped and Archegos began selling down its portfolio, causing other positions to also decline, resulting in margin calls"
(id., ¶¶ 144-145). Before the markets opened on March 24, 2021, Viacom announced the pricing of the SPOs:
146. At 7:00 a.m. ET on Wednesday, March 24, 2021, before the opening of the market, Viacom announced the pricing of the Offerings, specifically that the Common Stock [*10]would be offered at $85.00 per share and the Preferred Stock at $100.00 per share. Viacom's March 24, 2021 announcement identified all Defendants except U.S. Bancorp and ICBC Standard Bank as underwriters of both Offerings, identified U.S. Bancorp and ICBC Standard Bank as underwriters of the Preferred Offering, and referred investors to Morgan Stanley and J.P. Morgan for further information, including the preliminary prospectus supplements for the Offerings. On information and belief, the Underwriter Defendants reviewed and approved Viacom's March 24 announcement before it was issued
(id., ¶ 146). 
This announcement also identified all of the Underwriter Defendants as underwriters of one or both of the SPOs and referred investors to Morgan Stanley and JP Morgan for information, including the preliminary prospectus supplements (id.). The announcement also indicated that the Underwriter Defendants could purchase additional securities in each of the SPOs. The Plaintiffs allege that this statement was materially misleading:
147. Viacom's March 24, 2021 announcement again stated that Viacom had granted the Underwriter Defendants an option to purchase additional securities in each Offering. The announcement of the options was materially misleading because Morgan Stanley, Goldman Sachs, and the other Conflicted Defendant underwriters that were also prime brokers for Archegos already knew (i) that they held massive positions in Viacom stock to hedge their total return swaps with Archegos; (ii) that Archegos's extremely leveraged, massive position in Viacom meant that a fire sale of the Conflicted Defendants' Viacom positions was imminent; and (iii) that, as a result, there was no realistic possibility that the Underwriter Defendants would exercise the overallotment options to acquire and sell even more Viacom securities
(id., ¶ 147). 
The majority of the investors purchasing stock from the SPOs made their purchases on March 23 and 24, 2021, to close on March 26, 2021 (NYSCEF Doc. No. 74, ¶ 148). The price of Viacom's common stock fell to $70.10 per share at close on March 24, 2021 and the price of Viacom's preferred stock fell to $86 per share the same day (id., ¶ 149). The Plaintiffs allege that this drop was caused by an apparent lack of interest in the SPOs, particularly by Archegos (id., ¶ 150). 
As set forth in the AC, an article in the New York Times reported that the Underwriter Defendants had been counting on Archegos and Mr. Hwang to be the anchor investor in the SPOs, but that, some time after the SPOs had been announced and before they closed, Archegos did not buy shares in either of the SPOs, causing the SPOs to fall significantly short of their target:
148. The prospectus supplements for the Offerings were dated March 23, indicating that Viacom and the Underwriter Defendants agreed on the pricing on March 23. The March 23 prospectus date and the announcement of the pricing on March 24 mean that most investors who purchased in the Offerings placed orders on March 23 or March 24 to close on Friday, March 26.
149. Viacom's Common Stock price fell $21.15 per share, or more than 23%, from a close of $91.25 per share on March 23, 2021 to a close of just $70.10 on March 24, 2021. [*11]Viacom's Preferred Stock price fell $14.00 per share in its first day of "when issued" trading, or 14%, to close at $86.00 per share on March 24, 2021.
150. These declines were attributed to the "apparent lack of interest" in the Offerings, as noted by the Paul Weiss Report, and specifically Archegos's "lack of interest," as reported by the New York Times. According to an April 2, 2021 article in the New York Times, the Underwriter Defendants had been "counting on Mr. Hwang to be the anchor investor who would buy at least $300 million of the shares, four people involved with the offering said." However, after the Offerings were announced but before they were completed, Archegos reportedly "changed plans" and did not buy any shares in either Offering, which the New York Times reported "caused the ViacomCBS fund-raising effort to end with $2.65 billion in new capital, significantly short of the original target." On information and belief, Morgan Stanley, as lead book-running manager for the Offerings, informed Viacom that Archegos had decided not to buy any shares in the Offerings, contrary to the Underwriter Defendants' prior expectation that had been communicated to the Company.
151. Meanwhile, the margin calls to Archegos and collateral sales by its prime brokers continued while the Offerings' closing was pending. According to the Paul Weiss Report, on March 24, 2021, Credit Suisse determined that it would have to make a margin call on Archegos of over $2.5 billion on March 25. However, Archegos's CFO informed Credit Suisse that evening that Archegos no longer had the liquidity to meet Credit Suisse's forthcoming margin call or any other margin calls from its other prime brokers, as all Archegos's unencumbered cash had already been used up on margin calls from other prime brokers earlier that week. The Paul Weiss Report further detailed that Archegos's excess margin at Credit Suisse, which was $606 million on March 23, was by March 24 "wiped out by market movements and Archegos owed CS $177M of variation margin"
(NYSCEF Doc. No., ¶¶ 148-151). 
During the time of the SPOs, Archegos' prime brokers/swap counter-parties, including the Conflicted Defendants, continued to issue margin calls to Archegos (NYSCEF Doc. No. 74, ¶ 151). On March 25, 2021, Archegos informed its prime brokers/swap counter-parties including the Conflicted Defendants that it was not able to meet the margin calls and that it would need to carefully liquidate its investments in order to not tip the market (id., ¶ 152). Beginning on March 25, 2021, the prime brokers began to quickly liquidate their securities related to Archegos (id., ¶ 153). That same day, Viacom filed their final prospectus supplements (id., ¶ 156). Viacom's common stock closed that day at $66.35 per share (id., ¶ 155). 
The evening of March 25, 2021, Archegos allegedly held a call with its prime brokers, including the Conflicted Defendants, and informed them that it held between $9 and $10 billion in equity, a decrease of approximately $10 billion from the previous day, that it faced $120 billion in exposure, and that it could not meet its margin calls (NYSCEF Doc. No. 74, ¶ 157). Archegos allegedly requested that the prime brokers enter into a standstill agreement while Archegos unwound its positions, but the prime brokers declined (id.). The prime brokers allegedly did not agree to work together for an orderly sell off and, instead, several prime brokers, including some of the Conflicted Defendants, rapidly sold off Archegos-related securities to avoid a loss (id., ¶ 159). Some of these prime brokers, including Morgan Stanley, allegedly made block sales of such securities beginning on March 25, 2021 (id., ¶ 160). None of [*12]this was disclosed in any of the offering documents or in any supplement.
As pled in the AC, the Conflicted Defendants knew prior to the closing of the SPOs that the block sales of Viacom stock which had already begun would impact the market price of the stock, the Conflicted Defendants had a duty to update the Offering Documents to reflect this and they failed to do so:
152. On the morning of March 25, 2021, Credit Suisse issued two margin calls on Archegos for a total of over $2.8 billion. As the Paul Weiss Report detailed, however, on a 12:30 p.m. ET call that day, Archegos informed key Credit Suisse Credit Risk Management and Prime Services Risk personnel that it would not meet its margin calls that day, and that the remaining unencumbered cash Archegos had been holding "had been used up on margin calls from other prime brokers." Archegos told Credit Suisse that it would need to "carefully liquidate positions in order to not tip the market." On information and belief, Archegos likewise communicated to its other prime brokers, including Morgan Stanley, Goldman Sachs, Wells Fargo Securities, BNP Paribas, and Mitsubishi UFJ, that it did not have available cash to meet further margin calls and believed a rapid, uncoordinated liquidation of Archegos's investments threatened to "tip the market."
153. On March 25, with Archegos unable to meet the banks' margin calls and the banks focused on avoiding their own material losses, Archegos's prime brokers began to rapidly shed their Archegos-related securities. That day, Morgan Stanley sold $5 billion of its Archegos-related holdings.
154. Deutsche Bank, which as detailed above had sold its prime brokerage to Defendant BNP Paribas and was managing the business for BNP Paribas while transitioning its primebrokerage personnel, accounts, and systems to BNP Paribas, reportedly brokered a $4 billion private deal on March 25 to sell its Archegos-related positions. By the time of the Offerings, BNP Paribas had made substantial progress in integrating the Deutsche Bank prime-brokerage business, including implementing the "Fast Start" client program, which enabled prime-brokerage clients such as Archegos to face BNP Paribas as their prime broker while executing through Deutsche Bank's electronic equities technology. As alleged in ¶ 32, Deutsche Bank worked "collaboratively" and in "partnership" with BNP Paribas in responding to the Archegos collapse.
155. Viacom Common Stock closed at $66.35 on March 25, the day before the Offerings were to close.
156. At approximately 5:30 p.m. ET on March 25, Viacom filed the final prospectus supplements for the Offerings, dated March 23. The final prospectus supplements failed to disclose the information required by Item 508. They also contained substantially identical statements about the terms of the underwriting as those in the preliminary prospectus supplements set forth in ¶¶ 138 and 140, and those statements were materially false and misleading for the reasons provided in ¶¶ 141-42.
157. According to the Paul Weiss Report and other public reporting, on the evening of March 25, 2021, Archegos held a call with its prime brokers (i.e., among others, Conflicted Defendants Morgan Stanley, Goldman Sachs, Wells Fargo Securities, Deutsche Bank/BNP Paribas, and Mitsubishi UFJ), and notified them that it had only between $9 and $10 billion in equity—a decrease of approximately $10 billion from the previous day—and faced $120 billion in exposure and could not meet its margin calls. [*13]Archegos requested that the prime brokers enter into a standstill agreement while Archegos unwound its positions, which would have forestalled or mitigated the large declines in Viacom's and other companies' securities prices that were inevitable if the banks acted independently and sold off Archegos's securities collateral in the market, as they did. The prime brokers declined.
158. According to an April 1, 2021 article in the Wall Street Journal, after Archegos left the March 25 call, Credit Suisse and Nomura suggested that the prime brokerages work together over a month to unwind Archegos's trades, but Goldman Sachs and Morgan Stanley refused. According to this article, "as stocks in [Archegos's] portfolio remained pressured, it didn't have additional funds to provide its lenders. That forced the banks to sell Archegos's collateral holdings even as they were falling, exacerbating the selloff." The ensuing cascade of selloffs continued to drive Viacom's Common and Preferred Stock prices down.
159. A March 30, 2021 Financial Times report corroborated the Wall Street Journal article, stating that Goldman Sachs, Morgan Stanley, Credit Suisse, UBS, and Nomura discussed an orderly wind-down of Archegos positions that would minimize the market impact. According to the Financial Times, the banks did not agree on a plan for an orderly sell-off, and certain banks instead rapidly sold off Archegos-related securities to avoid their own losses.
160. An April 6, 2021 report by CNBC further detailed the "unprecedented wave of tens of billions of dollars in sales by Morgan Stanley and other investment banks" occurring at that time, including Morgan Stanley's March 25 block sales of Archegos-related securities. Those block sales enabled Morgan Stanley to avoid the massive losses the bank knew it faced due to Archegos's collapse and the banks' imminent liquidations of Archegos's collateral, which would necessarily crater the prices of the securities to which Archegos was exposed (including Viacom). CNBC reported:
[Archegos's] biggest prime broker quietly unloaded some of its risky positions to hedge funds, people with knowledge of the trades told CNBC.
Morgan Stanley sold about $5 billion in shares from Archegos' doomed bets on U.S. media and Chinese tech names to a small group of hedge funds late Thursday, March 25, according to the people, who requested anonymity to speak frankly about the transaction.
It's a previously unreported detail that shows the extraordinary steps some banks took to protect themselves from incurring losses from a client's meltdown. The moves benefited Morgan Stanley, the world's biggest equities trading shop, and its shareholders. While the bank escaped from the episode without material losses, other firms were less fortunate. . . .
Morgan Stanley had the consent of Archegos, run by former Tiger Management analyst Bill Hwang, to shop around its stock late Thursday, these people said. The bank offered the shares at a discount, telling the hedge funds that they were part of a margin call that could prevent the collapse of an unnamed client.
But the investment bank had information it didn't share with the stock buyers: The basket of shares it was selling, comprised of eight or so names including Baidu and Tencent Music, was merely the opening salvo of an unprecedented wave of tens of billions of dollars in sales by Morgan Stanley and other investment banks starting the very next day. . . .
That means that at least some bankers at Morgan Stanley knew the extent of the selling that was likely and that Hwang's firm was unlikely to be saved, these people contend. That knowledge helped Morgan Stanley and rival Goldman Sachs avoid losses because the firms quickly disposed of shares tied to Archegos. . . .
"I think it was an 'oh s---' moment where Morgan was looking at potentially $10 billion in losses on their book alone, and they had to move risk fast," the person with knowledge said
(NYSCEF Doc. No. 74, ¶¶ 152-160 [emphasis in original]).
On March 26, 2021, the SPOs closed (NYSCEF Doc. No. 74, ¶ 161) and the Conflicted Defendants allegedly continued massive stock sell-offs to minimize their exposure pursuant to the "total return swap agreements":
161. On Friday, March 26, 2021, the Offerings closed.
162. Simultaneously with the closing of the Offerings, the Conflicted Defendants continued their fire sale of Archegos-related securities, including Viacom. On March 26, Goldman Sachs reportedly made block sales of an additional $10 billion of its Archegos positions. Goldman Sachs sent out a client email pitching block sales of shares in Viacom, along with four other stocks in which Archegos was heavily invested. That email informed hedge funds that Goldman Sachs was selling large blocks of stock as a result of the involuntary deleveraging of a fund. Goldman Sachs would "give priority to customers who could buy as much stock as possible or several blocks of stock in different companies." According to CNBC, Goldman Sachs managed to sell most of the stock related to Archegos margin calls on March 26, helping Goldman Sachs avoid losses in the episode. Among other sales, Goldman Sachs reportedly sold 35 million shares of Viacom at midday on March 26—just two days after the announcement of the pricing of the Offerings—at a price of $48 per share, a 44% discount to the Offering price, for a total of approximately $1.7 billion. By contrast, Goldman Sachs sold 646,000 shares in the Common Offering. In other words, Goldman Sachs sold 54 times as many shares in its Archegos fire sale as it did in the Offering itself.
163. Morgan Stanley reportedly also marketed blocks of stock in multiple companies on March 26, simultaneous with the closing of the Offerings. Morgan Stanley reportedly sold $3.9 billion of Viacom, Discovery, and Farfetch, among others, on March 26.
164. Goldman Sachs and Morgan Stanley reportedly each sold multiple blocks of stock in the same companies at different times on March 26, as the companies' stock prices continued to decline, upsetting investors who bought at the earlier, higher prices. These two Defendants reportedly sold a total of $19 billion of Archegos-related securities on March 26 alone
(id., ¶¶ 161-164). 
As detailed in the AC, the Plaintiffs allege that a report by Bloomberg discussed that the massive block trades of Archegos' securities, including Viacom stock, were aberrant because they were conducted during normal trading hours and that these large block trades unnerved investors and put further downward pressure on Viacom's share price (id., ¶ 165). 
On March 26, 2021, NASDAQ reportedly halted trading of Viacom common stock three separate times, and the common stock closed at $48.23 per share (id., ¶ 166). The Plaintiffs [*14]allege that the fire sales of Viacom sales that began prior to the closing of the SPOs continued after the closing:
12. As Bloomberg reported on March 27, 2021, as early as March 24 and 25, before the Offerings even closed, Goldman Sachs sold $10.5 billion of the shares it held for Archegos, including Viacom shares. As the Wall Street Journal reported on March 28, 2021, Goldman Sachs "told some hedge funds on Friday that they were selling large blocks of stocks as a result of the involuntary deleveraging of a fund." Morgan Stanley sold $15 billion in Archegos-related securities over the course of a few days, including, as the Wall Street Journal reported, 45 million shares of Viacom on the night of Sunday, March 28, not even one business day after the Offerings closed. Bloomberg reported that the trade was priced at $46 to $47 per share. In other words, rather than acting as a stabilizing force in the Offerings, as the Offering Materials disclosed might happen, a lead underwriter dumped approximately $2.1 billion in Viacom stock (representing nearly 8% of the public float) overnight, at prices that were vastly below the offering price.
13. Meanwhile, Goldman Sachs orchestrated its own block sales, reportedly selling off approximately $1.7 billion of Viacom stock by midday on Friday, March 26, 2021 (35 million shares, priced at $48 each), according to an April 1, 2021 CNBC news report.
14. As a result, by Friday, March 26, when the Offerings closed, Viacom common shares—sold for $85.00 per share in the Common Offering—were trading at $48.23 per share, a nearly 45% decline. By the following Monday, those shares had fallen further to $45.01, nearly 50% below the Offering price. Similarly, the shares of Preferred Stock that were offered and sold for $100.00 per share were driven down to $67.50 per share on March 26 and $63.34 on March 29, nearly 37% below the Offering price. 
. . . 166. On March 26, 2021, Viacom Common Stock closed at $48.23, a 27% single day decline, the stock's largest decrease going back to at least 1990. The fire sale of Viacom caused so much volatility that NASDAQ temporarily halted trading of Viacom Common Stock three separate times on March 26.
167. Several of the Defendant banks continued to discuss the Viacom fire sale over that weekend, as Archegos's prime brokers continued to race to avoid their own material losses. According to the Paul Weiss Report, "Archegos and its prime brokers, including [Credit Suisse], Morgan Stanley, Goldman, Nomura, UBS, Wells Fargo, and Deutsche Bank had another call on Saturday, March 27. On that call, Archegos again tried to orchestrate a forbearance agreement with its lenders, whereby Archegos would manage liquidating its positions rather than leaving each bank to do so individually." Archegos then left the call, leaving senior representatives of the banks, including their general counsels and outside legal counsel, to discuss next steps. As the Paul Weiss Report stated, "several banks including Deutsche Bank, Morgan Stanley, and Goldman determined that they were not interested in participating in a managed liquidation," meaning that each would rush to shed Archegos-related shares on its own.
168. Conflicted Defendants Morgan Stanley, Goldman Sachs, Wells Fargo Securities, BNP Paribas, and MUFG Securities (through its affiliate Mitsubishi UFJ) were engaged in these massive block trades, which mitigated their own losses while dramatically driving down Viacom's share prices, on the days before the Offerings that they [*15]underwrote closed, on the very day those Offerings closed, and in the days that followed. What is more, these large block trades sold volumes of shares that were several multiples of the volume the Conflicted Defendants sold in the Offerings. For example, the March 30, 2021 article in the Wall Street Journal reported that Morgan Stanley sold 45 million shares of Viacom on Sunday, March 28, 2021 (which Bloomberg reported were priced at $46.00-$47.00 per share, for a total of approximately $2.1 billion), in private block sales—five times the number of common shares Morgan Stanley sold as lead bookrunner in the Offerings.
169. On Monday, March 29, 2021, Wells Fargo Securities told its clients that it had continued selling off Viacom shares that day—and had unwound all of its Archegos exposure without the bank suffering any losses. Similarly, Goldman Sachs announced on March 29, 2021, that any losses it anticipated relating to Archegos would be "immaterial" due to its loans being fully collateralized and its being "first to begin reducing exposure"
(id., ¶¶ 12-14, 166-169).
The Concealed Planned Block Sales by the Conflicted Defendants
In the AC, the Plaintiffs allege that the Conflicted Defendants, by their own admissions, planned the block sales of Viacom stock prior to the SPOs but waited to conduct all of them until after the SPOs had closed in order to minimize their losses:
221. Key Defendants have admitted that they knew about the block sales conducted concurrent with the Offerings, but concealed them from public investors to avoid the banks' own material losses.
222. In Morgan Stanley's first-quarter 2021 earnings call on April 16, 2021, Morgan Stanley's CEO, James Gorman, highlighted that the bank had "liquidated some very large single stock positions through a series of block sales culminating on Sunday night, March 28. That resulted in a net loss of $644 million, which represents the amount the client owed us under the transactions that failed to pay us. Subsequently, we made a management decision to completely de-risk the remaining smaller long and short positions which, while not especially problematic, might have been. We decided we would be out of the risk as rapidly as possible and, in so doing, incurred an incremental loss of $267 million. I regard that decision as necessary and money well-spent. The results are all reflected in Q1." He concluded by noting that he was "very pleased with how the institution came together and responded to this very complex situation."
223. Gorman made clear that protecting itself from risks like those Archegos posed was part of Morgan Stanley's "philosophy": "we cauterize the stuff and deal with it as soon as we possibly can. This was, as you know, a very unusual event. It was a family office, actually; no outside money. It got to enormous size by the growth in their single stock position, a very concentrated single stock long position that had explosive growth, and they're offset by the very shorts and the indices that they were short."
224. When asked why Morgan Stanley did not disclose its losses associated with Archegos sooner, Gorman admitted that the bank wanted to ensure the Offerings proceeded apace before cratering Viacom's stock price. According to Gorman, "It was complicated I will say, . . . by the fact that one of the large single stock positions related [*16]to a security in which we have been an underwriter, and we thought the right thing to do was to close that previous underwriting which happened on that Friday. So we had to hold off which caused us to be later than some, if you will. And the reason for that was not that we weren't aware of what was going on, we just felt we had an underwriting obligation to deal with."
225. In other words, Gorman admitted that senior Morgan Stanley executives who (a) knew about and were responsible for underwriting the Offerings, and also (b) knew about and had control over the bank's block sales of Viacom and other Archegos-related securities, were "aware of what was going on" but affirmatively decided to let the Offerings close without disclosing the block sales that drove Viacom's share prices down to a fraction of what Plaintiffs and the Class paid in the Offerings. Rather than disclose material negative information that would surely have caused the Offerings to fail—costing Morgan Stanley $20 million in underwriting fees and limiting Morgan Stanley's ability to mitigate its own losses—Morgan Stanley reaped its fees and sold hundreds of millions of dollars of Viacom securities to investors at highly inflated prices, knowing that the prices of those securities would be decimated by the banks' impending block trades.
226. Similarly, in its first-quarter 2021 earnings call on April 14, 2021, Goldman Sachs admitted that at the same time it underwrote the Offerings, Goldman Sachs was already conducting block sales of Archegos-related securities, including massive block sales of Viacom Common Stock on the day the Offerings closed, to avoid its own losses. On that call, Goldman Sachs' CEO, David Solomon, highlighted that Goldman Sachs had "identified the risk early and took prompt action," and was "pleased with how the firm handled it and it's a reflection of the engagement and communication of teams across Goldman Sachs, both in the business and on the control side of our firm."
227. Goldman Sachs, like Morgan Stanley, admitted that it placed its interests before those of Plaintiffs and the Class. Despite having "identified the risk early" and being "very, very aware of the embedded risk" in the bank's prime brokerage (including its relationship with Archegos), Goldman Sachs breached its disclosure obligations as an underwriter of the Offerings and sold hundreds of millions of dollars of Viacom securities to unsuspecting investors at highly inflated prices while reaping underwriting fees for itself. In doing so, Goldman Sachs avoided billions of dollars of its own losses, all while knowing that the prices of the securities it sold in the Offerings would be decimated by the banks' impending block trades.
228. In addition, subsequent public reporting evidences the Conflicted Defendants' knowledge that Archegos was imploding and lacked available capital to meet the banks' margin calls, and accordingly there was not sufficient demand for Viacom securities to support the prices the Underwriter Defendants and Viacom set for the Offerings. On April 3, 2021, the New York Times reported that, after the Offerings were announced, as the Underwriter Defendants "canvassed the investor community, they were counting on Mr. Hwang to be the anchor investor wo would buy at least $300 million of the shares, four people involved with the offering said. But sometime between the deal's announcement and its completion that Wednesday morning, Mr. Hwang changed plans." The Conflicted Defendants knew that a key investor that they relied on for 10% of the capital to be raised in the Offerings pulled out
(NYSCEF Doc. No. 74, ¶¶ 221-228 [emphasis in original]).
Conflicted Defendants knew or should have known and failed to disclose that the SPOs stock prices were going to drop
The Plaintiffs further allege that the Underwriter Defendants priced Viacom's common stock and preferred stock at above market value prices and failed to make the necessary disclosures explaining their pricing. Because the SPOs were follow-on offerings and not initial public offerings, the Plaintiffs allege that the pricing should have been a market-driven decision (NYSCEF Doc. No. 74, ¶ 174). The Plaintiffs allege that at the time the prices of the SPOs were set, the Conflicted Defendants knew or should have known that the market prices of the stock would plummet and that they should have downwardly priced the SPOs to account for the anticipated drop in price (id., ¶ 176). 
To be clear, in the AC, the Plaintiffs allege that the Offering Documents contained both material misstatements and omissions. In addition, the Plaintiffs allege that the following SEC and FINRA regulations also were violated with regard to the SPO disclosures: 
• Item 505(a)
The Plaintiffs allege that because the SPOs were priced at above market values, Item 505(a) of SEC Regulation S-K required the defendants to disclose and describe the various factors considered in determining the offering price, and that this was not done (NYSCEF Doc. No. 74, ¶ 178).

 • Item 508(k) and (l)
Pursuant to Item 505(k) of Regulation S-K, the Plaintiffs allege that the Underwriter Defendants were required to disclose their block sales transactions because even passive market transactions permitted by Rule 103 of Regulation M require disclosure (NYSCEF Doc. No. 74, ¶ 142).
Pursuant to Item 508(l)(1) of Regulation S-K, the Plaintiffs allege that the Underwriter Defendants were required to disclose any transaction that they intended to conduct to stabilize, maintain, or otherwise affect the market price of the offered securities, and to disclose information on any other transaction that affects the price of the offered securities, the nature of such transactions, and how such transactions would affect the market (NYSCEF Doc. No. 74, ¶ 182) and this was not done because the Offering Documents failed to disclose that, at the time they became effective, Archegos had already failed to meet margin calls and the Conflicted Defendants were already arranging massive block sales of Viacom's common stock that would inevitably crater the market and drive down the price of both the common stock and preferred stock of Viacom (id., ¶ 183). This the Underwriter Defendants knew or should have known as they should have done proper due diligence on each other, including as to the Conflicted Defendants and whether the Conflicted Defendants had any conflicts in conducting the SPOs and/or serving as lead or other underwriters in the SPOs. Stated differently, the Plaintiffs argue that the statements contained in the Offering Documents that the Underwriter Defendants could conduct stabilizing transactions became materially misleading because the Underwriter Defendants knew or should have known because they had a duty to do due diligence on the other underwriters and ask whether conflicts existed and had they done this they would have known of the looming undisclosed massive block sales of Viacom's [*17]stock by the Conflicted Defendants and that such massive sales would materially affect the price of the shares.
• Rule 408
The Plaintiffs further allege that the Offering Documents contained misrepresentations by failing to disclose material information sufficient to make the statements in the Offering Documents not misleading, in violation of Rule 408 of SEC Regulation C (NYSCEF Doc. No. 74, ¶¶ 184-185). • Financial Industry Regulatory Authority (FINRA) Rule 5270
FINRA operates to protect investors by regulating broker-dealers to ensure that the broker-dealer industry operates fairly and honestly. The Plaintiffs also allege that the Conflicted Defendants misled potential investors in violation of FINRA Rule 5270 by failing to disclose their block sales of Viacom stock by conducting such sales based on material, non-public market information and by placing their own financial interests ahead of the customers' interests (NYSCEF Doc. No. 74, ¶¶ 189-190). 
F. The SEC's Response to this fiasco
On December 15, 2021, the SEC voted to propose rules to prevent fraud, manipulation and deception in connection with effecting transaction in attempting to induce the purchase or sale of any security-based swap:
The Securities and Exchange Commission (''SEC'' or ''Commission'') is re-proposing for comment a rule under the Securities Exchange Act of 1934 (''Exchange Act''), which would be a new rule designed to prevent fraud, manipulation, and deception in connection with effecting transactions in, or inducing or attempting to induce the purchase or sale of, any security- based swap. The rule is designed specifically to take into account the unique features of a security-based swap and would explicitly reach misconduct in connection with the ongoing payments and deliveries that typically occur throughout the life of a security- based swap. The Commission also is proposing a new rule, which would make it unlawful for any officer, director, supervised person, or employee of a security-based swap dealer or major security-based swap participant, or any person acting under such person's direction, to directly or indirectly take any action to coerce, manipulate, mislead, or fraudulently influence the security-based swap dealer's or major security-based swap participant's chief compliance officer (''CCO'') in the performance of their duties under the federal securities laws or the rules and regulations thereunder. Finally, the Commission is using its authority under the Exchange Act to propose for comment a new rule, which would require any person with a security-based swap position that exceeds a certain threshold to promptly file with the Commission a schedule disclosing certain information related to its security-based swap position.
(SEC Release No. 34-93784; NYSCEF Doc. No. 172)
According to the Press Release, this new proposed rule was to address both credit default swaps that caused the 2008 crises and also the risks which materialized when Archegos collapsed:
SEC Proposes Rules to Prevent Fraud in Connection with Security-Based Swaps Transactions, to Prevent Undue Influence over CCOs and to Require Reporting of Large Security-Based Swap Positions
For Immediate Release
2021-259
Washington D.C., Dec. 15, 2021 — The Securities and Exchange Commission today voted to propose fraud, manipulation and deception in connection with security-based swaps, to prevent undue influence over the chief compliance officer (CCO) of security-based swap dealers and major security-based swap participants (SBS Entities), and to require any person with a large security-based swap position to publicly report certain information related to that position.
"The 2008 crises had many chapters, but a form of security-based swaps — credit default swaps — played a lead role throughout the story," said SEC Chair Gary Gensler. "In March, when Archegos Capital Management collapsed, we saw once again the risks that might arise from the use of another security-based swap — total return security-based swaps. As part of the Dodd-Frank Act of 2010, Congress granted this agency broad authority with regard to security-based swaps, including three important authorities we're acting upon here today."
Specifically, the proposed new Rule 10B-1 would prohibit fraudulent, deceptive or manipulative conduct in connection with all transactions in security-based swaps, including misconduct in connection with the exercise of any right or performance of any obligation under a security-based swap. Further, proposed new Rule 15Fh(c) would prohibit personnel of an SBS Entity from taking any action to coerce, mislead or otherwise interfere with the SBS Entity's COO.
Finally, proposed Rule 10B-1 would require any person, or group of persons who owns a security based swap position that exceeds the threshold amount set by the rule to promptly file with the SEC a statement containing the information required by Schedule 10B on the SEC's EDGAR filing system. The filings will be publicly available. Such transparency could provide relevant parties with advance notice that certain market participants are building large positions and could facilitate risk management and inform pricing of security-based swaps.
The proposals will be published in the Federal Register. The comment period will remain open for 45 days after publication in the Federal Register 
(NYSCEF Doc. No. 173).

Discussion
The 1933 Act "protects investors by ensuring that companies issuing securities make a full and fair disclosure of information relevant to a public offering" (Omnicare, Inc. v Laborers Dist. Council Const. Indus., 135 S Ct 1318, 1323 [2015] [internal quotation marks and citation omitted]). The "linchpin" of the 1933 Act "is its registration requirement," which "must contain specified information about both the company itself and the security for sale" (id., at 1323). Sections 11, 12, and 15 of the 1933 Act impose "strict liability for material misstatements contained in registered securities offerings" (NECA-IBEW Health & Welfare Fund v Goldman Sachs & Co., 693 F3d 145, 148 [2d Cir 2012]).
On a motion to dismiss pursuant to CPLR 3211, the court must afford the pleading a liberal construction and accept the facts as alleged in the complaint as true, according the plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit any cognizable legal theory (Leon v Martinez, 84 NY2d 83, 87-88 [1994]).
It is well settled that in order to survive a CPLR 3211 motion to dismiss, a claim brought under the 1933 Act need not satisfy the heightened pleading standing of CPLR 3016(b) and must only satisfy CPLR 3013's notice pleading requirements (Feinberg v Marathon Patent Group Inc., 193 AD3d 568, 570-571 [1st Dept 2021]; Rubenstein v. Credit Suisse Group AG, 457 FSupp3d 289 [2020] ["a heightened pleading standard applies to securities fraud claims brought under Section 10(b) of the Securities Exchange Act, a Section 11 claim need only satisfy the basic notice pleading requirements of Federal Rule of Civil Procedure 8(a)(2)"]; In re Initial Public Offering Sec. Litig., 241 FSupp2d 281, 341 [SD NY 2003] ["Whether Rule 8(a) or 9(b) is triggered turns on the type of claim alleged (i.e., the cause of action) rather than the factual allegations on which the claim is based [b]ecause a Section 11 claim is not a fraud claim, Rule 8(a) applies. That the same factual allegations also give rise to a Rule 10b-5 claim is irrelevant to this analysis"]).
As this Court previously discussed, claims brought under the 1933 Act are, at the heart, negligence-based claims where the statute imposes the duty — i.e., to act truthfully in the offering of public securities. A defendant's state of mind is not relevant because scienter is not an element under Sections 11 or 12(a)(2) (i.e., as opposed to a claim based on fraud or otherwise under the Securities and Exchange Act of 1934) (In re Uxin Limited Sec. Litig., 2020 WL 1146636, * 6 [Sup Ct, NY County 2020]; In re Netshoes Sec. Litig., 68 Misc 3d 788, 794-795 [Sup Ct, NY County 2020]). As relevant to the case at nisi prius, 
a defendant's knowledge of an alleged omission is also irrelevant and need not be pled to state a claim under Section 11:
[T]o make out a prima facie case at the pleadings stage, Plaintiffs need only allege a material misstatement or omission. Neither knowledge nor reason to know is an element in a plaintiff's prima facie case
(In re Initial Public Offering Sec. Litig., 241 FSupp2d at 343, citing In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig., 202 FSupp2d 8, 12 [SD NY 2001]; see also Degulis v. LXR Biotechnology, Inc., No. 95 Civ. 4204, 1997 WL 20832, at *3 [SD NY 1997]).
It is firmly established that liability for an issuer of a security under Section 11 is almost absolute while other defendants bear the burden of demonstrating an affirmative due diligence defense (In re Initial Public Offering Sec. Litig., 241 FSupp2d at 343, citing Herman & MacLean, 459 US 375, 381—82, 103 S Ct 683, 686-687 [1983]; see also In re AnnTaylor Stores Sec. Litig., 807 FSupp 990, 998 [SD NY 1992]). For the reasons set forth below, however, the specific facts involved in this case involve a narrow exception to issuer liability.
Section 11 of the 1933 Act imposes liability based on the contents of a registration statement, both for what it includes and for what it omits (Omnicare, 1315 S Ct at 1327-1330; In re Uxin Limited Sec. Litig., 2020 WL 1146636, *7). Whether a statement is materially false or misleading is viewed at the time such statement is made — not retroactively, in hindsight (In the Matter of Netshoes Sec. Litig., 64 Misc 3d 926, 933 [Sup Ct, NY County 2019]); Rubenstein, 457 FSupp3d at 295-296, citing Charter Twp. Of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC, No. 08- CV-7062, 2010 WL 4642554, at *11 [SD NY 2010] [citation omitted] ["plaintiff may not plead a Section 11 claim 'with the benefit of 20/20 hindsight' or base the claim on a 'backward-looking assessment' of the registration statement"]).
In determining whether a misstatement or omission is material must be viewed in the context all of the defendants' representations taken together and in context and whether it would have misled a reasonable investor (Rombach v. Chang, 355 F3d 164, 172 n 7 [2d Cir 2004]). An [*18]omission is material if "in light of the information already disclosed to investors there is a substantial likelihood that the disclosure of the [omitted material] would have been viewed by the reasonable investor as having significantly altered the total mix of information [already] made available" (Rubenstein, 457 FSupp3d at 295, citing In re ProShares Trust Secs. Litig., 728 F3d 96, 102 [2d Cir 2013] [citations omitted and alterations and emphasis in original]).
Rule 408(a) of Regulation C provides that "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading." Rule 403 requires the disclosure of (i) "any person who is known to the registrant to be the beneficial owner of more than five percent of any class of the registrant's voting securities" and (ii) company holdings owned by directors, nominees, and executive officers.
Failure to comply with requirements of SEC Regulation S-K is actionable under the 1933 Act (Matter of PPDAI Group Sec. Litig., 66 Misc 3d 1226[A], at **10-11 [Sup Ct, NY County 2020]). Item 505(a) provides that "where there is a material disparity between the offering price of the common equity being registered and the market price of outstanding shares of the same class, describe the various factors considered in determining such offering price." Item 508 of Regulation S-K requires in relevant part:
(k) Passive market making. If the underwriters or any selling group members intend to engage in passive market making transactions as permitted by Rule 103 of Regulation M (§ 242.103 of this chapter), indicate such intention and briefly describe passive market making.
(l) Stabilization and other transactions.
(1) Briefly describe any transaction that the underwriter intends to conduct during the offering that stabilizes, maintains, or otherwise affects the market price of the offered securities. Include information on stabilizing transactions, syndicate short covering transactions, penalty bids, or any other transaction that affects the offered security's price. Describe the nature of the transactions clearly and explain how the transactions affect the offered security's price. Identify the exchange or other market on which these transactions may occur. If true, disclose that the underwriter may discontinue these transactions at any time;
(2) If the stabilizing began before the effective date of the registration statement, disclose the amount of securities bought, the prices at which they were bought and the period within which they were bought. If you use § 230.430A of this chapter, the prospectus you file under § 230.424(b) of this chapter or include in a post-effective amendment must contain information on the stabilizing transactions that took place before the determination of the public offering price; and
(3) If you are making a warrants or rights offering of securities to existing security holders and any securities not purchased by existing security holders are to be reoffered to the public, disclose in a supplement to the prospectus or in the prospectus used in connection with the reoffering:
(i) The amount of securities bought in stabilization activities during the offering period and the price or range of prices at which the securities were bought;
(ii) The amount of the offered securities subscribed for during the offering period;
(iii) The amount of the offered securities subscribed for by the underwriter during the [*19]offering period;
(iv) The amount of the offered securities sold during the offering period by the underwriter and the price or price ranges at which the securities were sold; and
(v) The amount of the offered securities that will be reoffered to the public and the public offering price.
(17 C.F.R. § 229.508)
However, liability under Section 11 can not be imposed for the failure to disclose what was not known where there was no duty to know or for the lack of clairvoyance (Donlon v NIO Inc., 2022 NY Slip Op 06993 [1st Dept 2022]). To wit, in Donlon v NIO, the plaintiffs purchased American depositary shares from or traceable to the initial public offering of NIO, an electric car company based in Shanghai, China. The offering documents in NIO's IPO included certain statements regarding the Chinese government's electric vehicle subsidy program. The plaintiffs' claims against NIO included claims for allegedly omitting that certain of NIO's customers would frontload their purchases to take advantage of the subsidy program before the subsidies were reduced. The trial court (Ostrager, J.) rejected the argument. On appeal, the Appellate Division held that these claims failed "most fundamentally because plaintiffs do not allege that NIO was even aware of the front-loading at the time of the IPO, and NIO could not have disclosed what it did not know" (id., at * 2). The Appellate Division also held that, because NIO warned investors of the potential risk with respect to the subsidy program, they did not need to predict the manner in which that risk would manifest (id., citing Kohl v Loma Negra Cia. Indus. Argentina S.A., 195 AD3d 414, 416 [1st Dept 2021]). In other words, the Appellate Division held that liability could not be predicated on NIO's failure to anticipate its customer's potential reaction to a change in government subsidies — or a lack of clairvoyance.
Liability also can not be imposed where the investors were warned of the exact risks that later materialized even if they did not predict "the precise manner in which the risks will manifest" (In re ProShares Trust Secs. Litig., 728 F3d at 102; see also Elite Aviation LLC v Credit Suisse, 588 Fed Appx 37, 38 [2d Cir 2014]; Kohl, 195 AD3d at 416). Stated differently, there is no cause of action under Section 11 if it is proved that at the time of acquisition the "it is proved he knew of such untruth or omission" (15 USC § 77k[a]).
Neither accurate statements about past performance, nor expressions of puffery and corporate optimism are actionable under the securities laws (In the Matter of Netshoes Sec. Litig., 64 Misc 3d at 926; Rombach v Chang, 355 F3d 164, 174 [2d Cir 2004]; Nadoff v Duane Reade, Inc., 107 Fed Appx 250, 252 [2d Cir 2004]). Statements of puffery and/or corporate optimism are also inactionable (Rombach, supra, 355 F3d at 174).
Section 12 imposes liability on any person who offers or sells securities of a prospectus containing material misstatements (Mahar v General Electric, 65 Misc 3d 1121, 1129 [Sup Ct, NY County 2019], affd 188 AD3d 534 [1st Dept 2020], citing In re Morgan Stanley Info. Fund Sec. Litig., 592 F3d 347, 359 [2d Cir 2010]).
FINRA Rule 5270 titled Front Running of Block Transactions prohibits FINRA members and persons associated with a member from selling securities when the member or person associated with the member causing order to be executed has material non-public information concerning an imminent block transaction. To wit, FINRA Rule 5270 (a) provides:
No member or person associated with a member shall cause to be executed an order to buy or sell a security or a related financial instrument when such member or person [*20]associated with a member causing such order to be executed has material, non-public market information concerning an imminent block transaction in that security, a related financial instrument or a security underlying the related financial instrument prior to the time information concerning the block transaction has been made publicly available or has otherwise become stale or obsolete
The Supplementary Material to FINRA Rule 5270 (a) provides:
.04 Permitted Transactions.
(a) Rule 5270 does not preclude transactions that the member can demonstrate are unrelated to the material, non-public market information received in connection with the customer order. These types of transactions may include:
(1) transactions where the member has information barriers established to prevent internal disclosure of such information;
(2) transactions in the same security related to a prior customer order in that security;
(3) transactions to correct bona fide errors; or
(4) transactions to offset odd-lot orders.
(b) Rule 5270 does not preclude transactions undertaken for the purpose of fulfilling, or facilitating the execution of, the customer block order. However, when engaging in trading activity that could affect the market for the security that is the subject of the customer block order, the member must minimize any potential disadvantage or harm in the execution of the customer's order, must not place the member's financial interests ahead of those of its customer, and must obtain the customer's consent to such trading activity. A member may obtain its customers' consent through affirmative written consent or through the use of a negative consent letter. The negative consent letter must clearly disclose to the customer the terms and conditions for handling the customer's orders; if the customer does not object, then the member may reasonably conclude that the customer has consented and the member may rely on such letter for all or a portion of the customer's orders. In addition, a member may provide clear and comprehensive oral disclosure to and obtain consent from the customer on an order-by-order basis, provided that the member documents who provided such consent and such consent evidences the customer's understanding of the terms and conditions for handling the customer's order.
(c) The prohibitions in Rule 5270 shall not apply if the member's trading activity is undertaken in compliance with the marketplace rules of a national securities exchange and at least one leg of the trading activity is executed on that exchange
(id., Supplementary Material .04).
I. Viacom and the Individual Defendants' motion to dismiss (Mtn. Seq. No. 002) must be granted
Relying on Lin v Interactive Brokers Group, Inc., 574 FSupp2d 408 (SD NY 2008) (holding that "[a] cognizable claim under Section 11 or 12 of the 1933 Act requires plaintiffs to, at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering" [internal quotation marks and citations omitted]), Panther Partners, Inc. v Ikanos Communications, Inc., 538 FSupp2d 662 (SD NY [*21]2008) (rejecting the argument that because orders were higher in 2003 and 2004 it would have led to a decrease in 2006 because the defendants did not have a duty to track customer inventory or advise customers to reduce their orders, and that, absent such a duty, the defendants could not have known that orders would decrease in 2006), and Donlon v NIO Inc., 2022 WL 17490797 (1st Dept 2022) described above, Viacom argues that they can not be held liable for that which they did not know. 
More specifically, Viacom argues that the lawsuit must be dismissed against them because the Plaintiffs can not allege that Viacom knew or could have known of Archegos' substantial position (as according to the AC, Archegos deliberately sought to and did conceal its position by keeping its actual stock position below 10% to avoid public disclosure) or the potential closing of the swap positions because they were not swap-counter parties (NYSCEF Doc. No. 74, ¶ 104) and, the Conflicted Defendants indicate that they were forbidden by regulation from sharing information about their trading activities with their underwriting divisions and Viacom (see Memorandum of Law in Support of Motion to Dismiss by Morgan Stanley & Co. LLC and Goldman Sachs & Co. LLC, at 5-6, 17-18 [NYSCEF Doc. No. 83]).
In addition, Viacom argues that Item 505 did not require them to make any additional disclosures. The Plaintiffs allege that at the time of the SPOs, there was a clear and growing material disparity between the $85 offering price for the Class B common stock and its market price and this disparity required the disclosure that the price would likely further decline resulting from the margin calls to Archegos and the related block sales that certain of the Underwriter Defendants were organizing. The problem is, Viacom argues, that, as the AC makes clear, there was no material disparity. On March 23, 2021, the stock offering was priced at $85 per share (NYSCEF Doc. No. 74, ¶¶ 146-48) and the Class B common stock closed at $91.25 per share (id., ¶ 144) and this difference was based on dilution caused by the issuance of additional shares (id., ¶ 178). Nowhere in Item 505 or in any related SEC guidance does the SEC suggest that "material disparity" is measured at a time other than when the offering is priced. Second, although Viacom was unable to locate 1933 Act cases finding violations of Item 505, cases involving violations of Item 105 hold that issuers must disclose known"material factors that make an investment in the registrant or offering speculative or risk (17 CFR § 229.105[a]); Kohl, 195 AD3d at 417). Put another way, Viacom argues that if there were additional disclosures required, they were required by the Underwriter Defendants, not Viacom.
Viacom further argues that Item 508(l)(1) of Regulation S-K (17 CFR 229.508[l][1]) which requires the disclosure of "any transaction that the underwriter intends to conduct during the offering that stabilizes, maintains or otherwise affects the market price of the offered securities" both did not require disclosure at all and certainly not by them because Item 508(l)(1) does not impose a duty on issuers (Stumf v. Garvey, No. 02-MDL-1335 (PB), 2005 WL 2127674, at *13 n 17 [D NH 2005]), and that because they had no duty to disclose they can not be held liable for this alleged material omission (see Blackmoss Invs. Inc. v Aca Capital Holdings, Inc., No. 07-CV-10528 (RWS), 2010 WL 148617, at *10 [SD NY 2010]).
In addition, Viacom argues FINRA regulations simply do not apply to them because they are not FINRA members and otherwise does not create disclosure duties relating to offering materials and that Rule 408 has no separate application in this case because Section 11 and Section 12(a)(2) already require the disclosure of material information necessary to make the Offering Documents not materially misleading (Rudman v CHC Grp. Ltd., 217 FSupp 718, 730 [SD NY 2016] [Rule 408 "imposes the same duty as the Securities Act to disclose information [*22]necessary to make other disclosures not misleading"]).
Viacom also argues are that the risk disclosures in the Offering Documents regarding (i) stabilization transactions engaged in by the Underwriter Defendants, (ii) the prime broker transactions in Viacom securities, (iii) Viacom's stock price and trading volatility and (iv) the impact on Viacom's Class B stock caused by the preferred stock offering or future sales of Class B stock were all forward-looking statements and thus protected by the PSLRA's safe harbor if the Plaintiffs fail to show the statements were made without actual knowledge of their falsehood (15 USC § 78u-5[c]). Thus, Viacom argues that because the AC does not allege that Viacom knew about Archegos' trading activities (and in fact alleges that they were hidden from Viacom), the risk disclosures are simply inactionable forward looking statements (Plumbers & Pipefitters Nat'l Pension Fund v Davis, No. 16-CV-3591 [GHW], 2020 WL 1877821, at *11 [SD NY 2020] ["Corporations are generally shielded from liability for risk disclosures by the 'bespeaks caution' doctrine or the closely related PSLRA safe harbor for forward-looking statements"] [internal citation omitted]).
Viacom additionally argues that the AC fails to adequately allege that the Offering Documents were false because the risk disclosures in the Offering Documents indicated that "changing investment priorities" of stockholders or prospective stockholders and future substantial sales could have a material impact on the stock price such that the possibility of Archegos's caused trading activity was in any event disclosed by the risk disclosures. (NYSCEF Doc. No. 74, ¶¶ 200, 202; Kohl, 195 AD3d at 16). Requiring Viacom to disclose that Archegos might be unable to satisfy a margin call and that various Conflicted Defendants might be forced to sell shares sold as collateral where Viacom did not know that Archegos was a stockholder, would improperly "create a new [disclosure] obligation grounded in guesswork" (Jaroslwicz v MT & T Bank Corp., 962 F3d 701, 713 [3d Cir 2020], cert denied 141 S Ct 1284 [2021]).
Additionally, Viacom asserts that the Offering Documents were not misleading in disclosing that Viacom corporate insiders were bound by certain lock-up statements and other agreements and therefore could not sell their shares because the Conflicted Defendants were planning to engage in block sales of the Viacom stock as part of the Lock-up Statement and Overallotment Statement and that such sales would drive down the price (NYSCEF Doc. No. 74, ¶¶ 195, 197) because one thing has nothing to do with another and in any event the Offering Documents disclosed that the underwriters may engage in "investment and securities activities [that] involve our securities and instruments" (NYSCEF Doc. No. 74, ¶ 198). In other words, this very risk is inactionable because the Plaintiffs' claims are contradicted by the disclose of risk made (Olkey v Hyperion 1999 Term Tr., Inc., 98 F3d 2, 9 [2d Cir 1996] [affirming dismissal where "plaintiffs' claims are contradicted by the disclosure of risk made on the face of each prospectus"]; Stadnick v Vivint Solar, Inc., No. 14-CV-9283 [KBF], 2015 WL 8492757, at *11 [SD NY 2015], affd 861 F3d 31 [2d Cir 2017]). The Lock-up Statement is also inactionable Viacom argues because it truthfully advised potential investors that certain insiders had agreed to retain their shares for a specific period of time and the Overallotment Statement merely accurately described that the Underwriter Defendants held options to purchase additional shares in the SPOs. Nothing indicated that the investors would be prevented from block sales.
Finally, Viacom argues that the AC does not allege that Viacom acted negligently in preparing the Offering Documents establishing a due diligence defense of the other defendants and they can not be held liable if they acted reasonably in assuring themselves that the Offering Documents did not contain any material omissions (15 USC § 77k[b][3][A]; 15 USC § 77l[a][2]) [*23]and the AC does not adequately plead standing because the AC only indicates that the Plaintiffs purchased Class B common stock and Preferred Stock directly from the Underwriter Defendants pursuant to the respective Offering Documents (NYSCEF Doc. No. 74, ¶ 23). This they argue is insufficient. More specifically, Viacom argues that because when the SPOs commenced roughly 97 % of the shares available for purchase by the public were not issued pursuant to the March 2021 prospectus supplement, it is possible that the shares were existing Class B common stock rather than new stock. Lastly, Viacom argues that the Plaintiffs fail to establish standing under Section 12(a)(2) because they fail to establish that Viacom was a statutory seller and do not plead when and at what price it purchased its preferred shares.
In their opposition papers, the Plaintiffs argue that Viacom is strictly liable for the statements made in the Offering Documents, such that lack of knowledge is not a defense. The Plaintiffs argue that, where a security is purchased that has been issued pursuant to a registration statement, the plaintiff "need only show a material misstatement or omission to establish its prima facie case. Liability against the issuer of a security is absolute, even for innocent misstatements" (Herman & MacLean v Huddleston, 459 US 375, 382 [1983]). The Plaintiffs further argue that Viacom is unable to cite a single case for the proposition that claims against an issuer can be excused on due diligence grounds and the caselaw supports the notion that an issuer is strictly liability for misstatements or material omissions. Relying on Herman & MacLean, the District Court for the District of Connecticut held that "innocent misstatements, even when the issuer was duly diligent in preparing the securities offering at question, are subject to a strict liability standard" (Hutchison v CBRE Realty Finance, Inc., 638 FSupp2d 265, 274 [D Conn 2009]). 
The Plaintiffs additionally argue that even if Viacom were not subject to a strict liability standard, the information was in fact knowable to Viacom. They argue that Viacom should have investigated its stock prices when they rose in early 2021 because the rise was not in line with market norms. This should have raised a red flag that a massive investor in Viacom was causing unusual market moves. They also allege that Viacom was told that Archegos had pulled out of the SPOs before the SPOs closed, and this should have given Viacom notice that Archegos was having liquidity issues. The Plaintiffs allege that all of this information would have been available to Viacom if they had simply asked the underwriters what was happening, but they failed to do that. This failure, the Plaintiffs argue, demonstrates that Viacom did not conduct sufficient due diligence to shield itself from the material misstatements and omissions in the Offering Documents. 
The Plaintiffs also argue that Viacom can not hide behind the argument that the Conflicted Defendants were forbidden by regulation from telling Viacom about their trading activities because these "ethical walls" appear to have been breached by the Conflicted Defendants, such that a regulatory prohibition is not sufficient to overcome the Plaintiffs' contention that the Conflicted Defendants could have told Viacom about the massive looming fire sales of Viacom stock. 
Lastly, the Plaintiffs argue that Viacom's disclosures in the Offering Documents that there may be shifting priorities of Viacom's security holders or that the underwriters were free to engage in transactions with respect to Viacom securities is an insufficient disclosure because they allege that Viacom should have known of the looming block sales.
The Plaintiffs arguments fail, and especially fail to establish a duty of disclosure that Viacom failed to meet. 
Although it is true that the 1933 Act is a strict liability statute and that knowledge is not an element of a 1933 Act claim, the 1933 Act does not impose liability for the failure to know that which the issuer has no duty to know. In other words, issuers are required to present truthful and accurate pictures of their financial position, outlook, the material risk factors that affect or could impact their performance and the manner in which their financial books and records, outlook and guidance is arrived at and audited. This is all within the ambit of what issuers have a duty to know and disclose in connection with an offering of securities pursuant to the 1933 Act. Issuers are not however required to have clairvoyance (Donlon v NIO Inc., 2022 NY Slip Op. 06993 [1st Dept 2022]), do not have the duty to investigate whether their underwriters have undisclosed conflicts and do not become guarantors of any concealed misconduct or misstatements by their underwriters as to the underwriters' trading practices. This simply is not within the scope of their disclosure obligations under the 1933 Act. 
The diligence required of an issuer as to an underwriter is set forth in the statute and in the regulations and is limited to, among other things, understanding that the underwriters are capable of bringing the securities to market and that failing the market clearing the offering that the underwriters are capable of buying a pre-set amount of unsold shares — i.e., stabilizing transactions — which are disclosed. Neither the statute nor the SEC rules impose any further duty upon the issuer as to the underwriters, nor make the issuer a guarantor of the underwriters undisclosed trading positions. Implying any such duty runs afoul of the principles articulated in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 US 164 (1994). 
Statements about the transactions that the underwriters may engage in or omissions about block sales the underwriters may engage in are not made by the issuers and they can not be held liable for statements made in Offering Documents not made or reasonably attributable to them. Stated differently, the issuer in the offering documents is not making a statement about the underwriters and any potential undisclosed conflicts or concealed planned block sales that the underwriters may engage. These statements are made by the underwriters. Underwriters "underwrite" companies, their historical and projected performance and the manner in which such information is derived, not vice versa. Thus, it does not matter whether Viacom may have been able to sleuth an answer about the underwriters undisclosed conflicts or planned block sales because they had no duty to do so. Indeed, the SEC's proposed rules in response to Archegos' collapse highlights that the SEC understands that these positions are concealed as the proposed rule would have the Archegoses of the world file a Schedule 10B in respect of their position so that issuers and the market generally would be aware of their otherwise concealed position. Were this rule to take effect, then perhaps a Section 11 claim would lie on these facts as an issuer could not stick its head in the sand as to such a known substantial position taken in its equity.
Equally unavailing to ground liability is FINRA Rule 5270. It does not apply to issuers because issuers are not members nor are issuers associated with members merely because underwriters sell stock in their companies in connection with a public offering.
Therefore, the claims against Viacom must be dismissed with prejudice.
Section 15 of the 1933 Act "creates liability for individuals or entities that 'control [ ] any person liable' under section 11 or 12" of the Act and, thus, "relies in part on a plaintiff's ability to demonstrate primary liability under sections 11 and 12" (In re Morgan Stanley Info. Fund Sec. Litig., 592 F3d 347, 358 [2d Cir 2010]). Because the Section 11 and 12 claims are dismissed against Viacom, the Section 15 claims must be dismissed as against the Individual Defendants.
II. The Conflicted Defendants (Morgan Stanley and Goldman Sachs') motion to dismiss (Mtn. Seq. No. 003) is denied
The Conflicted Defendants argue that they are entitled to dismissal because the Plaintiffs do not allege that an actionable material misstatement or omission existed when the Offering Documents became effective. To wit, relying on Hoffman v AT & T Inc., 67 Misc 3d 1212[A], at * 4 [Sup Ct, NY County 2020], the Conflicted Defendants argue that the critical issue under Section 11 of the 1933 Act is whether the Offering Documents contained an untrue statement or omission of fact when the Offering Documents became effective and the effective date of the Offering Documents is the earlier of (x) when the prospectus supplements were first used or (y) the date of the first contract of sale of securities in the offering to which the prospectus supplements relate (17 CFR § 230.430B; Fed. Hous. Fin. Agency v Nomura Holding Am., Inc., 74 FSupp3d 639, 649 n 19 [SD NY 2015]). Thus, they argue that the Offering Documents became effective as of March 24, 2021. As of this date, they argue Archegos had not missed any margin calls. Because the Plaintiffs claim that the Conflicted Defendants intended to engage in the fire sales of Viacom stock as a result of Archegos missing margin calls, they argue that the Plaintiffs have not pled that the Conflicted Defendants knew of the fire sales or intended to conduct them as of the effective date of the Offering Documents. 
The Conflicted Defendants further argue that there is no duty under Section 11 to amend a registration based on developments after the effective date that make the registration statement untrue (In re Alliance Pharmaceutical Corp. Sec. Litig., 279 FSupp2d 171, 184 [SD NY 2003]) and therefore a failure to amend the registration statement to reflect the block sales of Viacom stock does not give rise to a cause of action under Section 11. 
The Conflicted Defendants additionally argue that the Plaintiffs do not identify any violation of any statutory disclosure obligation. They argue that there is no claim under Item 505(a) because there was no material disparity between the offering price and the market price of the shares when the offering price was announced. More specifically, the Conflicted Defendants argue that the Plaintiffs' contention that the Underwriter Defendants were obligated to update the Offering Documents is unsupported by Item 505 or Section 11 generally. Nor was an update required they argue under Section 512(a) because there was no fundamental change in Viacom's position. They also argue that there was no duty to disclose pursuant to Item 508(k), which requires disclosure of any intention to engage in passive market making transactions or Item 508(l) which requires disclosure of any transaction that any of the Underwriter Defendants intended to conduct during the SPOs that would stabilize, maintain, or otherwise affect the market price of the securities. The Conflicted Defendants further argue that disclosure of the block sales of Viacom stock was not required because these were not sales for the purpose of stabilizing the market price of the securities. They argue that the Plaintiffs' own pleading underscores why disclosure was not required. The purpose of the fire sales of Viacom stock was for the Conflicted Defendants to avoid material losses. To wit, the Conflicted Defendants argue that the purpose was not to stabilize or otherwise affect the market price of the securities offered in the SPOs. Thus, because Item 508 explicitly requires disclosure of transactions conducted for the purpose of stabilizing, transactions for other purposes is not required (Geiger v Solomon-Page Group, Ltd., 933 FSupp 1180, 1187-1188 [SD NY 1996] ["The absence of a regulation requiring disclosure, in the fact of the detailed requirements of what information about selling shareholders must be disclosed, is some evidence that the information the plaintiff seeks to require is not in fact material The fact that the SEC does not require disclosure of this fact is [*24]further support for this conclusion because it reflects the SEC's expert view that such disclosure is not required"]). 
The Conflicted Defendants argue that FINRA Rule 5270 also can not be invoked as a basis for liability under the federal securities laws (Richman v Goldman Sachs Group, Inc., 868 FSupp2d 261, 275 [SD NY 2012]; In re Morgan Stanley Technology Fund Sec. Litig., 643 FSupp2d 366, 278 n 7 [SD NY 2009]) and it does not impose a duty to disclose. They argue that, even if FINRA Rule 5270 could underpin a securities claim, the rule prohibits certain forms of trading but creates no disclosure obligation pursuant to the Offering Documents and therefore the failure to disclose can not form the predicate for a 1933 Act claim based on a violation of FINRA Rule 5270 (In re Morgan Stanley Tech. Fund Sec. Litig., 643 FSupp2d 366, 378 n 7 [SD NY 2009] ["the NASD Rule governing 'Communications with the Public' — Rule of Conduct 2210 — does not cover registration statements and prospectuses. Accordingly, no duty to disclose the purported omissions arises under this body of law"]). The Conflicted Defendants argue that Rule 408 of Regulation C does not impose a duty beyond the plain language of Section 11 of the 1933 Act (Rudman v CHC Group Ltd., 217 FSupp3d 718, 730 [SD NY 2016] ["Regulation C requires registrants to add such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading. This provision imposes the same duty as the Securities Act to disclose information necessary [to] make other disclosures not misleading"] [internal quotation marks omitted]). The Conflicted Defendants also argue that Item 403 of Regulation C is simply inapplicable and does not require disclosure of Archegos' holding.
The Conflicted Defendants also argue that the Plaintiffs fail to allege a false or misleading statement of material fact in the Offering Documents. They dispute that the statements made by the CEOs of Morgan Stanley or Goldman Sachs constitutes an admission and they argue that because the Offering Documents disclosed that the underwriters could engage in certain transactions of Viacom stock, there was no obligation to disclose the block sales that were planned when the Offering Documents were made effective. 
In support of this argument, the Conflicted defendants rely principally on Wilson v Merrill Lynch & Co., Inc., 671 F3d 120 (2d Cir 2011) and Rubinstein v Credit Suisse Group AG, 457 FSupp3d 289 (SD NY 2020). In Wilson, the plaintiff purchased auction rate securities (ARS) through E*Trade. Merrill Lynch was alleged to have followed a uniform policy of placing support bids to prevent failures in every auction in which it was the sole or leader auction dealer. The plaintiff further alleged that this masked the liquidity risks inherent in ARS based on the lack of auction failures. Put another way, the plaintiffs in that case alleged that if Merrill had not bid support the auctions the auctions would have failed and investors would have seen the liquidity risks associated with ARS. When Merrill withdrew its support, 87% of all ARS auctions failed and investors like the plaintiff were left with illiquid securities. For Merrill's part, relying on a number of disclosures as it related to their ARS auction practices, Merrill argued that this was not concealed and that as such dismissal was required. There had been an SEC investigation beginning in 2004 and ending in 2006 resulting in a settlement with several ARS broker-dealers including Merrill. The SEC filed a Cease-and-Desist Proceedings, Making Findings, Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and 15(b) of the Securities Exchange Act of 1934. The Order indicated that the ARS brokers-dealers had violated the securities laws by intervening without adequate disclosures by among other things proprietary bidding to prevent auctions from [*25]failing. Significantly, the Order indicated that the issue was the disclosures and there was nothing that prohibited broker-dealers from bidding for the proprietary accounts. Merrill was required (i) to pay $1.5 million, (ii) to provide a written description of material auction practices and procedures to ARS issuers and (iii) at all times make a description of its then-current material auction practices and procedures available to (x) all customers and broker-dealers who are participating through Merrill in an ARS auction on the portion of website accessible to such customers and broker-dealers and is related to such auction and (y) the general public on another portion of its website accessible to the general public. In response, Merrill posted the following disclosures:
• "Auction procedures generally permit auction dealers like Merrill Lynch to buy and sell, in their sole discretion, auction rate securities for their own account between auctions at any time." Id. at 102.
• "Merrill Lynch is permitted, but not obligated, to submit orders in auctions for its own account either as a bidder or a seller, or both, and routinely does so in its sole discretion." Id.
• "Merrill Lynch may routinely place one or more bids in an auction for its own account to acquire auction rate securities for its inventory, to prevent an auction failure ... or an auction from clearing at a rate that Merrill Lynch believes does not reflect the market for the securities." Id. at 103.
A "bid" refers to an auction order placed by holders or prospective investors to indicate their desire to continue to hold or acquire ARS at or above a specified interest rate. • "Bids by Merrill Lynch or by those it may encourage to place bids are likely to affect the clearing rate, including preventing the clearing rate from being set at the maximum rate or otherwise causing bidders to receive a higher or lower rate than they might have received had Merrill Lynch not bid or not encouraged others to bid." Id.
• "Because of these practices, the fact that an auction clears successfully does not mean that an investment in the securities involves no significant liquidity or credit risk. Merrill Lynch is not obligated to continue to place such bids ... in any particular auction to prevent an auction from failing or clearing at a rate Merrill Lynch believes does not reflect the market for the securities. Investors should not assume that Merrill Lynch will do so or that auction failures will not occur." Id.
• "Merrill Lynch may submit a bid in an auction to keep it from failing, but it is not obligated to do so. There may not always be enough bidders to prevent an auction from failing in the absence of Merrill Lynch bidding in the auction for its own account or encouraging others to bid. Therefore, auction failures are possible, especially if the issuer's credit were to deteriorate, if a market disruption were to occur or if, for any reason, Merrill Lynch were unable or unwilling to bid." Id. at 105.
Based on the disclosures, the trial court dismissed the case. On appeal, the court held that there was no material difference between the disclosure that Merrill "might routinely place bids" and that it would place bids in every auction (Wilson, 671 F3d at 135). Thus, the Conflicted Defendants argue that disclosure of the block sales was not required because the Offering Documents indicated in the Offering Documents that they could own and trade Viacom stock.
In Rubinstein, Credit Suisse created and issued certain notes designed to track the Volatility Index of the S & P 500 Index. These notes were issued pursuant to a registration [*26]statement, prospectus, prospectus supplement, and pricing supplement. These documents included disclosures, among others, that (i) these notes were intended for sophisticated investors to use on a short-term basis and that holding the notes for longer periods posed significant risks, (ii) if Credit Suisse exercised its right to accelerate the notes investors would likely lose part or all of their initial investment, and (iii) Credit Suisse intended to hedge its own exposure and that this hedging activity could affect the value of the notes. The Court dismissed the claims because the Pricing Disclosure
"clearly disclosed Defendants' intention to hedge its exposure and the effects that such rebalancing and hedging activity could have on the value of the ETNs The Section continued to expressly warn that 'the costs of maintain or adjusting this hedging activity could affect value of the Index and accordingly the value of the ETNs." Id. This warning is repeated numerous times throughout the Pricing Supplement".
(Rubinstein, 457 FSupp3d at 296). In other words, the Conflicted Defendants argue that because they disclosed that they could engage in transactions involving Viacom stock, the case must be dismissed against them because that is what they did.
Lastly, the Conflicted Defendants argue that neither the Underwriter Defendants nor Viacom had the obligation to determine what current stockholders planned to do with the stock at the time of the SPOs.
The Conflicted Defendants arguments all fail.
The alleged failure by the Conflicted Defendants to disclose their conflict of interest constituted a material omission even in the absence of a regulation compelling such disclosure (In re WorldCom, Inc. Sec. Litig., 346 FSupp2d at 289). This is the import of Wilson and its progeny. Simply put, the Conflicted Defendants had to disclose their conflict of interest in the Offering Documents. There is nothing in the disclosures that the Conflicted Defendants made that suggested that they held massive stock positions (10X the size of the offering) pursuant to certain "total return swap agreements" and that if their swap-counter parties failed to make margin calls, they would sell the stock — and at the very moment in time that the SPOs were closing. This disclosure was required even before it was evident that Archegos' massive speculation that the Conflicted Defendants enabled was failing or failed. It was all the more required when it became clear that Armageddon was approaching as to the deterioration of the Archegos position. To be clear, this was entirely foreseeable and avoidable and represents either a failure of diligence in entering into these "total return swap agreements" and agreeing to underwrite the SPOs or just simple old-fashioned greed. 
In underwriting both the "total return swap agreements" and Viacom (and understanding its run up in stock price as analysists working at the Conflicted Defendants would have in following the stock) the Conflicted Defendants knew and understood the volatility of Archegos highly leveraged position and the risks underpinning the "total return swap agreements". In addition, stock prices typically drop at least slightly after the announcement of an offering because it sends a message to the market that the company thinks the stock is expensive (capital can be raised from many sources). Given the amount of leverage in the "total return swap agreements", this further highlighted the risks to the Conflicted Defendants that a margin call would be needed as undoubtedly the Conflicted Defendants had modeled the price of the Viacom stock in which a margin call would be required in underwriting the "total return swap agreements" in the first instance. That Archegos pulled out as an anchor investor because of [*27]liquidity issues sent a message to the Conflicted Defendants that both Archegos and (as a result of Archegos' imminent collapse) the SPOs were doomed. To be clear, it can not be said that their disclosure about being able to engage in market stabilizing transactions in any way put the public on notice of the free fall that the Conflicted Defendants created regarding the SPOs in selling massive positions of Viacom stock that they owned while the unsuspecting public purchased the same securities. These were the opposite of stabilizing transactions — taking away the public market for these securities. This is the critical difference between Wilson and Rubinstein and what the Conflicted Defendants did here.
Put another way, the Conflicted Defendants sold securities to unsuspecting investors after the Conflicted Defendants created a trap for those investors as to Viacom's share price, a trap that shielded the Conflicted Defendants from losses on their positions under the" total return swap agreements". This possibility was not disclosed and there was nothing in the disclosures that put the investors on notice that this was a possibility. The final prospectus supplements filed on March 25, 2021 contain no mention of the sales activity which had already begun and which the Conflicted Defendants knew would drive down the stock price. This is dishonesty in the sale of securities — i.e., the very opposite of what the 1933 Act requires. What makes this even more reprehensible was this was all while the Conflicted Defendants were collecting underwriting fees.
But, disclosure was required pursuant to Item 508 (In re Initial Public Offering Sec. Litig., 241 FSupp2d at 311-313) and the failure to make required disclosures under Item 508(l) is actionable (In re Enron Corp. Sec., Derivative & ERISA Litig., 610 FSupp2d 600, 626 [SD Texas 2009]). As discussed above, the fact that these were not market stabilizing transactions does not mean that disclosure was not required. It is the effect of the transaction, not the intent, that gives rise to the disclosure obligation (In re Initial Public Offering Sec. Litig., 241 FSupp2d at 383-384). Indeed, the fact that the Conflicted Underwriters intended to engage in block sales of Viacom stock made the disclosure that the Conflicted Defendants could engage in market stabilizing transactions materially misleading. Item 512 also requires an issuer to provide an update when material changes occur after the effective date. That is, although Item 512 applies to issuers, and does not specifically require the Conflicted Defendants themselves to provide an update, the Conflicted Defendants had a duty to disclose the material changes to Viacom and ensure that the Offering Documents were updated accordingly. The Conflicted Defendants could not continue underwriting the SPOs knowing that the Offering Documents were materially misleading without such update. Lastly, the failure to make disclosures under FINRA Rule 5720 can give rise to claims under the 1933 Act if the omissions are sufficiently material (In re Initial Public Offering Sec. Litig., 241 FSupp2d at 383-384). 
The Conflicted Defendants are also not correct that Item 505 does not apply. There was a material disparity between the offering price and the market price of the Viacom stock. On the day the SPOs were announced, the offering price of the Viacom Common Stock was $85 per share and the market price closed at $70.10 per share. This was, in and of itself, a material disparity. At the time of the Closing, the market price of Viacom Common Stock was $48.23 per share and by March 29, 2021, three days after the Closing, the market price was $45.01 per share. This demonstrates a growing material disparity such that it can not be said that Item 505 is inapplicable on these facts. Had the conflict been disclosed, as it was required to be disclosed in the Offering Documents, either the material disparity would have been greater and apparent on the day the SPOs were announced or the SPO would have been priced substantially lower [*28]taking into account these imminent block sales. Put another way, having concealed that Viacom's stock was artificially inflated at least in part by the massive speculation by Archegos that the Conflicted Defendants enabled, they are not then entitled to say that the material disparity did not exist and that therefore Item 505 does not apply.
As an initial matter, the due diligence defense is not available at the motion to dismiss stage of the litigation. In addition, the idea that liability can be avoided because alleged ethical walls prevented the broker-deal part of the Conflicted Defendants from disclosing the conflict to the underwriter department—or senior management above the underwriter department—of the Conflicted Defendants also is a fact issue, at a minimum, and seems otherwise to be simply nonsense (Enron, 2016 WL 2095973, at * 21 n 29). Someone working at some senior risk management level within the Conflicted Defendants (presumably at least the Chief Compliance Officer) had not only the ability to look over the walls but an obligation to do so as to prevent exactly this scenario from happening.
For completeness, as to the Section 12 claims, the relevant date is the date of closing, i.e., March 26, 2021. By this time, Archegos had defaulted on its margin calls and the Conflicted Defendants had already begun fire sales of Viacom stock such that they had already begun to affect the market price of Viacom stock. 
Finally, to the extent the Conflicted Defendants argue that the Plaintiffs have not sufficiently pled standing, because the Plaintiffs have pled that they purchased securities traceable to the SPOs, the argument is meritless.
In the AC, the Plaintiffs allege:
23. Plaintiff Camelot purchased Common Stock and Preferred Stock directly from one of the Underwriter Defendants pursuant to the respective Offering Materials issued in connection with the Offerings and has been damaged thereby.
24. Plaintiff MPERS is a statewide retirement system that provides retirement, disability, and survivor benefits to full-time police officers in Louisiana and their families, and has done so for over 48 years. MPERS oversees approximately $2.8 billion in assets on behalf of over 12,000 active participants. MPERS purchased Viacom Preferred Stock on the Preferred Offering directly from Defendant Morgan Stanley and has been damaged thereby
(NYSCEF Doc. No. 74, ¶¶ 23-24). This is sufficient at this stage of the proceeding (Matter of PPDAI Group Sec. Litig., 2020 WL 939362, at * 5 ["it is sufficient to allege that Plaintiffs purchased ADSs in connection with the IPO and Plaintiffs need not identify the specific defendant from whom they purchased the ADSs. Thus, Plaintiffs' statement in the [complaint] that they purchased shares in connection with the IPO and pursuant and/or traceable to the Offering Materials is sufficient for standing purposes "] [internal quotation marks and citation omitted]).
Thus, the motion to dismiss as against the Conflicted Defendants must be denied.
III. Wells Fargo's motion to dismiss (Mtn. Seq. No. 004) is denied
Wells Fargo, one of the Conflicted Defendants, argues that although it was a prime broker for Archegos, it was not a party to the "total return swap agreements" and although it admittedly liquidated some securities, it did not do so until March 29, 2021 (after the closing) and not pursuant to the "total return swap agreements", thus the case should be dismissed against [*29]them. As an initial matter, it does not matter that the sales occurred on March 29, 2021, what matters is that Wells Fargo knew that they intended to sell as of the date of the SPOs and this was not adequately disclosed. Thus, thus motion must be denied.
IV. MUFG Securities' motion to dismiss (Mtn. Seq. No. 005) is denied
MUFG Securities, one of the Conflicted Defendants, argues that the Plaintiffs impermissibly attempt to impute knowledge to MUFG Securities through a parent and affiliate entities. MUFG Securities argues that the allegations directed against it as one of the Conflicted Defendants should have been made as against its affiliate MUSHD or MUSHD's subsidiary MUSE, and that knowledge of either of those affiliates cannot properly be imputed to MUFG (Defer LP v Raymond James Financial, Inc., 654 FSupp2d 204, 2018 [SD NY 2009]). MUFG Securities argues that it never acted as a prime broker for Archegos and was not a counter-party to the "total return swap agreements" with Archegos, so it should be treated as one of the other Underwriter Defendants and not a Conflicted Defendant. In support of its argument that it was not a prime broker for Archegos, MUFG Securities notes that the Paul Weiss Report did not identify it as a prime broker for Archegos and that United States Senator Sherrod Brown on behalf of the US Senate Banking Committee in requesting information from various of Archegos' prime brokers never requested information from MUFG Securities or any of its affiliates. 
Putting aside that the Plaintiffs adduce reports from the Financial Times and Bloomberg list MUFG Securities or its affiliates as prime brokers for Archegos which at a minimum creates issues of fact as to whether MUFG Securities should be treated as a Conflicted Defendant or an Underwriter Defendant that is not a Conflicted Defendant such that dismissal on this ground would be inappropriate at this stage of the litigation, for the reasons set forth below this nuanced distinction between Conflicted Defendants and Underwriter Defendants is a distinction without significance at this stage of the pleadings. Thus, the motion must be denied
V. The Underwriter Defendants motion to dismiss (Mtn. Seq. No. 006) is denied
The Underwriter Defendants argue that dismissal is required because the AC fails to allege that any of the Underwriter Defendants who are not Conflicted Defendants had any relationship with Archegos or any knowledge of the Conflicted Defendants' relationship with Archegos and they argue that they were not required to duplicate the lead underwriters' investigation and diligence in order to fulfill their obligations as underwriters (17 CFR § 230.176; Feit v Leasco Data Processing Equip. Corp., 332 FSupp 544, 577 [ED NY 1971]). Thus, they argue their due diligence defense is established based on the AC itself (International Union of Operating Engineers Benefit Funds of Eastern Pennsylvania and Delaware v Camping World Holdings, Inc., 2020 WL 1939666, at * 8 [Sup Ct, NY County 2020, Schecter, J.]). 
The arguments fail. 
The 1933 Act provides guidance as to what constitutes a reasonable investigation and reasonable grounds for believe under Section 11. Nowhere does it provide that an underwriter need not ask relevant questions of each other to ensure that conflicts do not exist to prevent what occurred here from happening:
§ 230.176 Circumstances affecting the determination of what constitutes reasonable investigation and reasonable grounds for belief under section 11 of the Securities Act.
In determining whether or not the conduct of a person constitutes a reasonable [*30]investigation or a reasonable ground for belief meeting the standard set forth in section 11(c), relevant circumstances include, with respect to a person other than the issuer.
(a) The type of issuer;
(b) The type of security;
(c) The type of person;
(d) The office held when the person is an officer;
(e) The presence or absence of another relationship to the issuer when the person is a director or proposed director;
(f) Reasonable reliance on officers, employees, and others whose duties should have given them knowledge of the particular facts (in the light of the functions and responsibilities of the particular person with respect to the issuer and the filing);
(g) When the person is an underwriter, the type of underwriting arrangement, the role of the particular person as an underwriter and the availability of information with respect to the registrant; and
(h) Whether, with respect to a fact or document incorporated by reference, the particular person had any responsibility for the fact or document at the time of the filing from which it was incorporated.
International Union of Operating Engineers Benefit Funds of Eastern Pennsylvania and Delaware does not suggest a different result. In that case, the complaint was essentially silent about the underwriters other than identifying them in the complaint. In opposition to the motion to dismiss filed in that case, the plaintiffs merely urged that "a defense based on expertised statements (§77k[b][3][c]) is never subject to dismissal at the pleading stage". In dismissing the claims, the court disagreed indicating that the misrepresentations were "made on the authority of expert," the underwriters who were not corporate directors with broad access to information could reasonably rely on audited financial statements and the plaintiffs had failed to allege or assert any facts or asserted a basis for the underwriter defendants to question the audited financial statements. 

This case simply has no application to the facts at issue here. The misrepresentations asserted in this case are not based on misstatements in audited financial statements upon which the underwriters could reasonably rely without a red flag indicating that there were issues with the audited financial statements. This case involves, as to the Underwriter Defendants, their obligation to ask each other whether there are any conflicts. They can not merely obfuscate their obligation relying on the lead underwriters to come forward without making inquiry. They had to do their own diligence (Nuveen Winslow Large-Cap Growth Esg Fund v Lu, 2021 WL 5810418, at *2 [Sup Ct, NY County 2021]). As part of that due diligence, they had to ask questions and it does not matter that ethical walls within the Conflicted Defendants existed. As discussed above, someone in the compliance team had the ability to look over the wall and would have had to disclose to the Underwriter Defendants that the conflict existed. To the extent that the Underwriter Defendants conducted proper due diligence and can establish a due diligence defense, this can not be resolved at this stage of the litigation because the Underwriter Defendants are not relying on anything (WorldCom, 346 FSupp2d at 683; In re Lehman Bros Sec. & ERISA Litig., 799 FSupp2d 258, 317 [SD NY 2011]). 
In re WorldCom, Inc. Sec. Litig., 346 FSupp2d 628 (SD NY 2004, Cote, J.) is instructive. In WorldCom, the underwriters argued that they had no obligation to disclose that they, among [*31]other things, lent money and underwrote bonds that could have given rise to a conflict of interest. The Court held that "[i]nformation regarding relationships that undermine the independence of an underwriter's judgment about the quality of the investment can be material to an investor. As a consequence, non-disclosure of an underwriter or issuer's conflicts of interest can constitute material omissions, even where no regulation expressly compels the disclosure of such conflicts" (id., at 689). The court further explained:
Underwriters must exercise a high degree of care in investigation and independent verification of the company's representations. Overall, no greater reliance in our self-regulatory system is placed on any single participant in the issuance of securities than upon the underwriter. Underwriters function as a first line of defense with respect to material misrepresentations and omission in registration statements. As a consequence, courts must be particularly scrupulous in examining their conduct
(id., at 662 [internal quotation marks and citations omitted]). 
As the court further explained "[t]acit reliance on management assertions is unacceptable; the underwriters must play devil's advocate" (id., at 675). The Underwriter Defendants' motion to dismiss must therefore be denied. 
VI. BNP Paribas' motion to dismiss (Mtn. Seq. No. 008) is denied
BNP Paribas, one of the Conflicted Defendants, argues that it was not a prime broker for Archegos, did not issue margin calls, and did not make block sales. It argues that the Plaintiffs improperly conflate BNP Paribas and Deutsche Bank (AG) (Deutsche Bank). At the time of the SPOs, BNP Paribas' parent was in the process of integrating Deutsche Bank's prime brokerage business. As to the corporate form, BNP Paribas argues that there is no relation between it and Deutsche Bank, including no common ownership. BNP Paribas did not have the relationship with Archegos, did not hold securities, and did not sell them. Deutsche Bank did. BNP Paribas argues that Deutsche Bank's actions and knowledge should not be imputed to BNP Paribas and that BNP Paribas should be in the group of Non-Trading Underwriter Defendants. BNP also argues that the burden rests on the Plaintiffs to plead sufficient circumstances and factors to justify disregarding the corporate form (Brunswick Corp. v Waxman, 459 FSupp 1222, 1229 [ED NY 1978]) and that they have failed to do so here.
In their opposition papers, the Plaintiffs argue that at the time of the SPOs, the integration between Deutsche Bank and BNP Paribas was substantially complete and Deutsche Bank represented that it was effectively running BNP Paribas' underwriting business. Deutsche Bank's underwriting was essentially done on BNP Paribas' behalf and the same people involved with underwriting the SPOs were the same people involved in the BNP Paribas' sale of Viacom stock related to Archegos such that there is a plausible inference that BNP Paribas had actual knowledge (Yi Xiang v Inovalon Holdings, Inc., 254 FSupp3d 635, 644 [SD NY 2017]).
For the reasons set forth above, this does not matter, even were the court to treat BNP as an Underwriter Defendant and not a Conflicted Defendant, dismissal would not be appropriate. Therefore, the motion to dismiss must be denied.
VII. SMBC Nikko Securities' motion to dismiss is denied
For the reasons set forth above, SMBC Nikko Securities' motion to dismiss must be denied.
The Court has considered the defendants remaining arguments and finds them unavailing.
It is hereby ORDERED that Viacom and the Individual Defendants' motion to dismiss is granted; and it is further
ORDERED that the other motions to dismiss are denied; and it is further
ORDERED that the parties shall appear for a preliminary conference on February 16, 2023, at 12pm.
DATE 2/6/2023
ANDREW BORROK, J.S.C.
Footnotes

Footnote 1: NYSCEF Doc. No. 141, at 12.

Footnote 2: Pursuant to 7 C.F.R. § 240.13d-1(a), any person or entity who "is directly or indirectly the beneficial owner of more than five percent of the class [of equity securities] shall, within 10 days after the acquisition, file with the Commission, a statement containing the information required by Schedule 13D (§ 240.13d-101)." Under Section 13(d) of the Securities Exchange Act of 1934, any direct owner or indirect beneficial owner of 10% or more of a company's common stock (or other class of equity) must publicly file certain forms with the SEC disclosing their equity interests.